McBRIDE et al. v. FARRINGTON.

(Circuit Court, W. D. New York. May 12, 1904.)

No. 22.

1. INDIAN TERRITORY—INDIAN LANDS—MINERAL LEASES—VALIDITY.

By treaty of 1855, 10 Stat. 1116, a certain district within the Indian Territory was set off to the Choctaw and Chickasaw Nations, to be held in common, under the control of the tribal organizations in the district of its own jurisdiction. By Act Chickasaw National Legislature, passed 1886 (Laws Chickasaw Nation, p. 188), any resident citizens (not less than three) were authorized to form a corporate company to engage in developing coal mines. This act was amended September 24, 1887 (Laws Chickasaw Nation, p. 190), so as to include petroleum, natural gas, and asphaltum. Reservation of all lands containing deposits of such minerals was made by Act Cong. June 28, 1898, c. 517, § 13, 30 Stat. 498, which required payment of royalties for the benefit of the Indians; and the Chickasaw

statute also provided that after the formation of the company, and on compliance with such statute, the corporation was authorized to contract with capitalists to develop and work the mines. *Held*, that such acts impliedly authorized the leasing of coal and oil lands allotted to such Indians for a limited period for the tribal or individual benefit of such Indians, and that such leases were not void on their face.

2. SAME—CORPORATIONS—STOCKHOLDERS—INDIVIDUAL LIABILITY—STATUTES.

Where a corporation was organized under the laws of Wisconsin to develop mining lands in Indian Territory, and its stock was used in payment for an assignment of leases of Chickasaw mineral lands, such leases not being void ab initio, the burden of proof was on the plaintiff to show actual fraud in the assignment of such leases to the corporation, in an action to enforce a stockholder's personal liability for corporate debts under the statutes of that state declaring that a stockholder shall be personally liable where stock has been issued, except for money or property estimated at its true value actually received by the corporation equal to the par value of the stock.

3. SAME—RIGHTS OF CREDITORS.

Where a creditor of a corporation rendered services sued for without investigating the corporation's financial condition, and did not rely on the fact that the stock of the corporation was fully paid, he was not entitled to enforce a statutory stockholder's liability for debts on the ground that the stockholder's subscription had been paid by a transfer of the property at an excessive valuation.

Roberts, Becker, Messer & Groat (Tracy C. Becker and Alfred F. Becker, of counsel), for plaintiffs.

Brundage & Dudley (Frank Brundage, of counsel), for defendant.

HAZEL, District Judge. This is an action at law, brought by judgment creditors of the Western Oil & Mining Company, a corporation, against the defendant, to enforce his liability as a stockholder therein, under chapter 86 of the Revised Statutes of the State of Wisconsin for 1878, and acts amendatory thereof and supplementary thereto, pursuant to which the company was incorporated. Such organization and incorporation were effected on September 26, 1896, with a capital of $1,500,000 divided into shares of the par value of $10 each. Its primary objects and purposes were to engage in mining for coal, iron ore, and other minerals, and drilling for petroleum, in the Indian Territory and elsewhere; to acquire lands and property by purchase; and to carry on mining, prospecting, refining, and manufacturing the products developed by the corporation. It appears from the proofs that one Frank Burke, Jr., for himself and as trustee for the defendant and others interested in the formation of the company, assigned to the corporation at the time of its organization three certain leases or charters of oil and mineral lands situated in Indian Territory. The charters were apparently purchased by Burke from the Oil Springs Mining Company in October, 1890, the Gold Mining Company in September, 1896, and the Anvil Rock Mining Company in June, 1896, respectively. These charters were concededly granted to the companies mentioned some time in the month of October, 1890, by the Chickasaw Nation. The original charters were not produced at the trial. The defendant claimed they were lost. The three assignments from Burke to the Western Oil & Mining Company purported to transfer and convey the exclusive right to prospect for and mine, coal, petroleum, and

in general all minerals to be found upon the land described therein. According to the plaintiffs' theory, the capital stock was not issued for property sold to the company, as contemplated by the Wisconsin statute, for the reason that the leases in question were void, and therefore no actual fraud need be proven. The Wisconsin statute in terms provides that a stockholder shall be personally liable where stock has been issued by the corporation, except for money or property estimated at its true value actually received by it equal to the par value thereof. Were the leases and assignments to the corporation invalid? It cannot be denied that the different tribes of Indians from the earliest period have been under the control and protection of the government of the United States. The lands ceded to them have been guarded by the United States from encroachment and acquisition by others without their consent. The Cherokee Trust Funds, 117 U. S. 288, 6 Sup. Ct. 718, 29 L. Ed. 880. By the treaty of 1830 (7 Stat. 333) the United States granted to the Choctaw Nation the right in fee simple to occupy certain lands west of the Mississippi river during their existence as a nation. By the terms of the treaty this grant became liable to transfer and alienation only with the consent of the United States. The treaty of 1855 (10 Stat. 1116) provides for a renewal of the earlier treaty, and that the land therein described be held in common by the Choctaw and Chickasaw tribes or bands of Indians. A certain district within the territory conveyed was set off or assigned to each nation. It was further provided that none of the lands embraced within the limits specified could be sold unless both tribes or bands consented thereto. In the event of race extinction, or abandonment by the Indians of their tribal relations, the territory ceded to them as a nation was to revert to the United States. It is shown by the proofs that the lands set aside for the use of the Choctaw and Chickasaw Nations is still held by them in common, and is under the control of each tribal organization in the district of its own jurisdiction. As we have seen, it is contended by the plaintiffs that the leases or charters, together with the assignments which are the subject of this action, are invalid ab initio, and on account thereof the title to lands, privileges, and immunities purporting to be conveyed failed, and that, accordingly, no valid consideration whatever passed for the issue of stock to Burke and to the defendant. The specific grounds upon which the invalidity of the documents mentioned are claimed to be absolutely void are tersely set forth in plaintiffs' brief, as follows:

"First. The three leases or charters had no legal validity at any time, because they were issued in part to noncitizens of the Chickasaw Nation, in violation of the United States statutes, the statute of that nation, and the treaties. Second. The rights acquired under such charters or leases, if any, were assigned to noncitizens of the tribe, in violation of said statutes and treaties. Third. The lease of these lands to noncitizens and the assignment of said leases to noncitizens constituted an abandonment of the land, forbidden by said treaties under penalty of forfeiture of the land by the Indians."

The point that the source of title is not derived from the owners in common is not pressed. That the charters or leases were granted to the companies heretofore named pursuant to an act of the Legislature of the Chickasaw Nation passed 1886 (Laws Chickasaw Nation, p. 188) is admitted. Such act in part reads as follows:

"That any resident citizens (not less than three) of the Chickasaw Nation who may wish to form a corporated company to engage in developing coal mines, and to transport, ship or sell all coal mined beyond the limits of this nation shall be authorized to do so," etc.

This provision was subsequently, on September 24, 1887 (Laws Chickasaw Nation, p. 190), amended so as to include petroleum, natural gas, and asphaltum. The amendment also contained a provision for the payment of royalties amounting to 2 per cent. on all gross sales of said products. The stipulation of facts shows that the leases or charters in question were granted by the national secretary of the Chickasaw Nation to a company composed of three or more citizens of the Chickasaw Nation and others. From the phrasing of the introductory clause describing the lessees, it is thought by counsel for plaintiffs that the grant and privileges specified are restricted to citizens of the Chickasaw Nation alone, and that, as such leases seem to run to citizens and noncitizens of the nation, they are in contravention of the Chickasaw statute and of the laws of the United States. No testimony is found in the record that the words "and others" meant to preclude white persons from joining in the charters, and such a presumption is not warranted. But assuming the leases and grants were to citizens of the nation and to white persons, must such enactment providing "that any resident citizens (not less than three), may form a corporate entity to engage in mining coal and other minerals in the Indian Territory," be strictly construed to preclude white persons from participation in such companies? Upon this question, according to plaintiffs' view, depends the title of the leases in controversy and any rights secured thereunder. A careful examination of decisions by the Supreme Court of the United States interpreting analogous treaties discloses that lands ceded to Indian tribes by the government of the United States are held for their separate benefit. Within the boundary of the ceded territory, the Indians mentioned secured control of their tribal lands by treaty obligations. The cession of these lands with the inalienable right of control secured thereby during tribal existence could be defeated only by the reservation to the United States contained in the grant. My attention is called to no statute or decision prior to the passage of the Curtis Act of June 28, 1898, c. 517, 30 Stat. 495, holding that the Chickasaw Nation had no authority under the then existing laws to lease their possessions for a limited period to white persons for their tribal or individual benefits. On the contrary, many adjudications are found expressly recognizing such right, and enforcing contracts arising thereunder. It is not necessary, it is thought, to go into the numberless ramifications of Indian statutes and decisions of the courts construing them. Much time has been expended by the court in attempting to trace the multitudinous and correlative acts of Congress, inhibitive and permissive, all tending towards a faithful conservation of our treaty stipulations. Although the Chickasaw Nation, as has been said, was allowed by the government of the United States to make laws for the protection of its members and property, it is nevertheless quite well settled that Congress has the undoubted right to supersede a prior treaty, and to exercise such paramount authority over the nation as, in effect, may curtail and diminish their tribal prerogative. U. S. v.

Kagama, 118 U. S. 375, 6 Sup. Ct. 1109, 30 L. Ed. 228; Cherokee Nation v. Southern Kansas Ry. Co., 135 U. S. 641, 10 Sup. Ct. 965, 34 L. Ed. 295; Thomas v. Gay, 169 U. S. 264, 18 Sup. Ct. 340, 42 L. Ed. 740. It was decided very early in the history of our jurisprudence that white persons may, with its consent, reside in a nation holding lands under treaty stipulation. Commercial intercourse between citizens of the United States and bands of Indians has been common from the earliest period of our history. The Dawes Commission Report, commenting upon the subject, says:

"It must be assumed, in considering this question, that the Indians themselves have determined to abandon the policy of exclusiveness, and to freely admit white people within the Indian Territory; for it cannot be possible that they can intend to demand the removal of the white people, either by the government of the United States or their own. They must have realized that when their policy of maintaining an Indian community isolated from the whites was abandoned for a time it was abandoned forever."

See Stephens v. Cherokee Nation, 174 U. S. 448, 19 Sup. Ct. 722, 43 L. Ed. 1041.

Such being the fact, how can it be successfully contended in the absence of an express prohibitive statute, that leases or charters for a specific purpose and for a limited term by the Chickasaw Nation to white persons are absolutely void? In no sense may such contracts be construed as acquiring the lands of the nation in violation of treaty restrictions. It will not, I think, be seriously controverted that these "wards of the nation" have in past years engaged in what seemed an interminable field of litigation directly owing to leases and charters granted by them to white people within the Indian Territory. The point in controversy, though argued with signal ability, is not new. The evils and abuses attributable to the manner in which the title to these lands was held by the tribal bands in question, and the disposition which they made of such lands to whites, aroused Congress to adopt measures leading to the betterment of then existing conditions. The appointment of the Dawes Commission followed. Their report resulted in the enactment of stringent statutes to obstruct future spoliation, and tending to preserve such lands to the Indians. By Act June 28, 1898, c. 517, 30 Stat. 495, provision was made, among other things, for the allotment of lands among the citizens of the respective tribes, with the reservation that "all oil, coal, asphalt and mineral deposits in the lands of any tribe, are reserved to such tribe, and no allotment of such land shall carry the title to such oil, coal, asphalt or mineral deposits." Rules and regulations regarding leases of lands for mining and prospecting were promulgated and provided by the Secretary of the Interior. It is specifically provided by section 13 of the act (30 Stat. 498) that royalties shall be paid for the privilege secured by lease or charter, and, further:

"That nothing herein contained shall impair the rights of any holder or owner of a leasehold interest in any oil, coal rights, asphalt or mineral, which shall have been assented to by act of Congress, but all such interest shall continue unimpaired thereby," etc.

That section further provides:

"That, when, under the customs and laws heretofore existing and prevailing in the Indian Territory, leases have been made of different groups or parcels

131 F.—51

of oil, coal, asphalt or other mineral deposits, and possession has been taken thereunder, and improvements made for the development of such oil, * * * then such parties in possession shall be given preference in the making of new leases. * * * The rate of royalty to be paid by all lessees shall be fixed by the Secretary of the Interior."

By section 16 of the act (30 Stat. 501) it is made unlawful for any person to pay royalties or rents on any mineral or timber lands to the nation or its citizens, except such payment be made pursuant to rules and regulations prescribed by the Secretary of the Interior. These provisions would certainly presuppose the fact that it was very common for the Chickasaw Nation of Indians to make charters for mining coal and other minerals in the Indian Territory to white persons. But it is insisted that a strict observance of the statutes of the Chickasaw Nation and of the United States prevented the formation of mining companies by white persons in the Indian Territory, and, further, that the later acts of Congress must be given retrospective operation. I am unable to so hold. The Chickasaw statute does not in terms forbid leasing mining lands to white persons, and I have yet to find a statute of the United States which prohibits such leasing. The act of the Chickasaw Nation merely authorizes three or more citizens to form a corporation for mining, and points out the way in which such companies may secure corporate rights and protection under the Chickasaw statute. This inference finds support in the very language of the act. It is further provided in the act, to which reference is made, that after the formation of the company, and when it has complied with the Chickasaw statute, then the corporation is authorized and empowered to contract with capitalists, to employ help, and do such other "means" as may be necessary to develop and work the mines. This clearly presupposes the right to assign leases to white persons, for it will not be contended that, when authority is in terms given to contract with capitalists for prospecting and developing the lands, it was intended to restrict such right to citizens of the nation. It would be difficult to find a large number of capitalists among the tribal bands inhabiting the Indian Territory. It is elementary that, whenever a Legislature wishes to give retrospective operation to its acts, the intent to do so must be clear. In Atoka Coal & Mining Co. v. Adams, 104 Fed. 472, 43 C. C. A. 651, it was held that persons in the lawful possession and entitled to the usufruct of lands in the Choctaw Nation could grant leases to mine the coal on such lands for such royalties as might be agreed upon. To the same effect, see Ellis v. Fitzpatrick, 118 Fed. 430, 55 C. C. A. 260. If, prior to the passage of the Curtis act, valid leases for mining coal in consideration of the payment of royalties might be made between citizens of the nation and white persons, it is difficult to perceive why a similar lease to drill oil is invalid. In the case last mentioned the provisions of the "Dawes agreement" were squarely held to operate prospectively, and not retrospectively, on royalties accruing under existing leases. It is not necessary to prolong discussion upon this point. I am reasonably satisfied that the primary contention of the plaintiffs that the leases and assignments were void ab initio is without sufficient merit to justify this court in holding that the commission of fraud by the defendant need not affirmatively ap-

pear. Assuming this conclusion not well founded, it, nevertheless, from the foregoing remarks, must be perfectly manifest that there is grave doubt regarding the invalidity of the leases which are the subject of this controversy. Under such circumstances, I am of opinion that the burden is upon the plaintiffs to show actual fraud; and, moreover, that in giving credit to the corporation they must have relied upon the payment of property actually received by the corporation. The complaint charges that the issues of stock were fictitious and fraudulent. Other allegations based upon fraud committed by the defendant and the directors of the company are found in the complaint. Nothing, however, was shown to substantiate such claims, and therefore they need not specially be noticed. In explanation, however, of these allegations of the complaint, it is practically conceded that plaintiffs did not part with their services expressly relying upon the payment of money or property actually received by the corporation for the stock issued; nor is it claimed that they placed any reliance upon the value of the leases. Upon this point it is ingeniously insisted by counsel for plaintiffs that it is wholly immaterial whether the creditor relied upon any actual fraud, or whether the stock subscribed for was actually paid in cash or in property. To maintain the liability of the defendant as a stockholder, it is asserted that such liability arises out of the contractual obligation to pay for the stock issued to him either in money or in property estimated at the true value actually received. This assertion is vigorously opposed by the defendant. He contends that the burden is upon the plaintiffs to show actual fraud and deception, and, further, that the plaintiffs, in giving credit to the corporation, must have in good faith relied upon the statutory requirements. It is further contended that the assignments mentioned were made and delivered in absolute good faith, and hence no recovery can be had unless actual fraud be shown. As has been indicated, I have reached the conclusion that the plaintiffs' principal contention upon which the liability of the defendant stockholder is based must fail. The leases were not void, and, therefore, presumptively, of value. If the leases were in fact null and void, and no property whatever was paid into the company— none which honestly could be regarded as a fair equivalent to cash— and the corporation had practically parted with its entire capital stock, then the rule announced in Coit v. Gold Amalgamating Co., 119 U. S. 343, 7 Sup. Ct. 231, 30 L. Ed. 420, and in Whitehill v. Jacobs & Ano., 75 Wis. 474, 44 N. W. 630, would not, in my judgment, apply, and fraud upon the creditors would necessarily follow by implication. Flour City National Bank v. Shire, 88 App. Div. 401, 84 N. Y. Supp. 810; The White Corbin & Co. v. Jones, 86 Hun, 57, 34 N. Y. Supp. 203; Boynton v. Hatch, 47 N. Y. 225. It may be that the full-paid stock was exchanged for property grossly overvalued, and, if it appeared from the evidence that the plaintiffs relied upon such obvious overvaluation in giving credit to the corporation, a different conclusion would follow. The proposition that whenever property is paid for the capital stock of a corporation it must be taken at its reasonable cash value, needs no citation of authorities. Of course, allowance must always be made for honest differences of opinion as to the value of property, as well as for mistakes and errors of judgment. If it appears

that the value was intentionally excessive or fraudulently overvalued, a creditor without knowledge of the facts should not be hindered in the collection of his debt. Under such circumstances it must appear affirmatively that the creditor believed and relied that the stock of the corporation was fully paid and that actual fraud was committed in the payment of the stock. The principle announced by the Supreme Court in Coit v. Gold Amalgamating Co., supra, and in Whitehill v. Jacobs, supra, are decisive and controling upon this question. The language of the court in the Coit Case, for the purpose of emphasizing this point, may be quoted:

"If it were proved that actual fraud was committed in the payment of stock, and that the complainant had given credit to the company from a belief that its stock was fully paid, there would undoubtedly be substantial ground for the relief asked. But where the charter authorizes capital stock to be paid in property, and the shareholders honestly and in good faith put in property instead of money in payment of their subscriptions, third parties would have no ground of complaint. * * *" Again: "But where full-paid stock is issued for property received there must be actual fraud in the transaction to enable creditors of the corporation to call the stockholders to account. A gross and obvious overvaluation of property would be strong evidence of fraud."

No evidence has been offered by the plaintiffs of the actual value of these leases. They have proceeded upon the theory, as heretofore stated, that they were null and void. There is nothing before the court, assuming their invalidity, upon which to base a finding of overvaluation sufficient to warrant a judgment for the plaintiffs. It appears that the lands covered by the leases consisted of upwards of 200,000 acres, and that the incorporators believed said property rights were of greater value than the capital stock. It further appears that prior to the incorporation defendant was advised by counsel that such leases and charters were valid. Manifestly, some evidence, in view of these facts, should have been offered to rebut the presumption of good faith on the part of the defendant. The defendant is a stockholder in a Wisconsin corporation, and the plaintiffs' rights are governed by the statutes of that state. The interpretation placed upon that statute by the highest court of Wisconsin (Whitehill v. Jacobs, supra) must be followed here. Bucher v. Cheshire Railroad Company, 125 U. S. 555, 8 Sup. Ct. 974, 31 L. Ed. 795. The plaintiffs, without inquiring into the financial standing of the company, and without making any investigations whatever, performed the services which were the subject of the judgment against the corporation. There were no misrepresentations made or claimed. Stress is placed by the plaintiffs upon the legal and complete failure, upon the grounds herein discussed, of the title of the leases and of the assignments to the corporation. This, as has been observed, is thought to be an erroneous assumption, and therefore the plaintiffs cannot recover.

Judgment may be entered for the defendant, with costs.

### On Petition for Rehearing.

The foregoing opinion states that no statute enacted prior to the Curtis Act (Act June 28, 1898, c. 517, 30 Stat. 495), holding that the Chickasaw Nation had no authority under the then existing laws to grant leases to white persons, had been called to the court's attention.

This statement was not correct. Counsel for plaintiffs in their brief set out section 2116 of the Revised Statutes, which provides that:

"No purchase, grant, lease, or other conveyance of land, or of any title or claim thereto, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution," etc.

This broad and general provision has never in terms been repealed. The United States Attorney General, in an opinion reported in volume 18 of the Opinions of the Attorneys General, at page 238, construing this statute, held that such provision applied to the lands held in fee by the Five Nations, and that leases by such Indians to noncitizens were prohibited. Subsequent to this opinion, Congress, by Act March 1, 1889, c. 333, 25 Stat. 784, established a United States Court in the Indian Territory. Section 6 of that act provides that all laws theretofore enacted to prevent the Indian nation in question and other Indian nations from lawfully making leases for mining coal for a period not exceeding ten years were repealed. Jurisdiction over all controversies arising out of such leases or contracts was expressly vested in the United States Court established by the act. The language of section 6 might be held sufficiently broad to repeal the prohibitive statute under consideration, and not a mere revocation of such parts as prevent the Indian nations from leasing or contracting for mining coal for a period not exceeding ten years. Irrespective, however, of this suggestion, the later enactment of Congress of May 2, 1890 (26 Stat. 81, c. 182), enlarges the jurisdiction of the United States Court of the Indian Territory, and provides that such court shall have jurisdiction in all cases of contracts entered into by citizens of any tribe or nation with citizens of the United States in good faith and for valuable consideration, and in accordance with the laws of such tribe or nation, and such contracts shall be deemed valid and enforced by such courts. Defendant contends that these several acts of Congress nullified and invalidated section 2116. It would certainly seem that Congress intended to modify and repeal all laws which limited the right of tribal Indians located in the Indian Territory to execute contracts not expressly prohibited by the laws of the United States or of such tribe or nation. Whatever limitation previously existed, a fair construction of the language quoted from section 29 (26 Stat. 93) would seem to validate all contracts entered into by such Indians with citizens of the United States in good faith and for a good consideration, provided, as above mentioned, such contracts were entered into in accordance with the laws of the tribe or nations.

Stress is placed by counsel for plaintiffs upon the cases decided in the Indian Territory since the act of 1890, which show that noncitizens of the Chickasaw and Choctaw Nations could not hold Indian lands by conveyances or leases. The cases appear to make a distinction between conveyances and leases by Indians to white persons for town lots and improved farms. See Rogers v. Hill (Ind. T.) 64 S. W. 536; Kelly v. Johnson (Ind. T.) 39 S. W. 352. In Rogers v. Hill, supra, the court, without expressly deciding the question, doubted whether a lease of an improved farm for eight years was legal. In Kelly v. Johnson, supra, the court held that, even though no valid title by sale of property set apart for the use of Indians could be given by an Indian to a white

person, yet an action by a white person in possession under color of title might be maintained for forcible entry and detainer. These cases are not thought to be in point. Here, as has been stated, the Chickasaw Nation of Indians, pursuant to its laws, gave an incorporated company, presumably organized pursuant to their tribal laws, the right to mine for iron ore and other minerals and to drill for petroleum. At the time the charters were granted to the corporation and subsequently assigned by it, the provisions of the act of Congress above mentioned were in force. Although no authority is cited deciding the question whether the acts of Congress here thought to modify and repeal section 2116 validate contracts of the kind in controversy, it nevertheless is thought that the language employed is sufficiently clear to justify holding that all contracts relating to land, which do not transfer the title, entered into in good faith, for a good and sufficient consideration, and not specifically prohibited by the laws of the United States or of the Indian nation, are valid and may be enforced in the proper forum.

The motion for rehearing is denied.