## COIT *v.* GOLD AMALGAMATING COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF PENNSYLVANIA.

Argued November 18, 19, 1886. — Decided December 6, 1886.

Where the charter of a corporation authorizes capital stock to be paid for in property, and the shareholders honestly and in good faith pay for their subscriptions to shares in property instead of money, third parties have no ground of complaint.

A gross and obvious overvaluation of property conveyed to a corporation in consideration of an issue of stock at the valuation, is strong evidence of fraud in an action against a stockholder by a creditor to enforce personal liability for his debt.

This was a bill in equity against a corporation and its stockholders to enforce a debt due from the former against the latter. The case is stated in the opinion of the court.

*Mr. Edward F. Hoffman* and *Mr. Charles Hart* for appellant cited: *Tasker* v. *Wallace,* 6 Daly, 364; *Osgood* v. *King,* 42 Iowa, 478; *Wetherbee* v. *Baker,* 35 N. J. Eq. (8 Stewart) 501, 513.

*Mr. R. C. McMurtrie* (*Mr. Pierce Archer* was with him on his brief) cited: *Ochiltree* v. *Railroad Co.,* 21 Wall. 249; *Re State Ins. Co.,* 14 Fed. Rep. 28; *Re Telegraph Construction Co.,* L. R. 10 Eq. 384; *Cooper* v. *Frederick,* 9 Ala. 738, 742; *Re South Mountain Mining Co.,* 7 Sawyer, 30; *Same Matter,* 8 Sawyer, 366.

MR. JUSTICE FIELD delivered the opinion of the court.

The defendant, the North Carolina Gold Amalgamating Company, was incorporated under the laws of North Carolina, on the 30th of January, 1874, for the purpose, among other things, of working, milling, smelting, reducing, and assaying ores and metals, with the power to purchase such property, real and personal, as might be necessary in its business, and to mortgage or sell the same.

The plaintiff is the holder of a judgment against the company for $5489, recovered in the Court of Common Pleas of Philadelphia, on the 18th of May, 1879, upon its two drafts, one dated June 1st, 1874, and the other August 15th, 1874, each payable four months after its date. Unable to obtain satisfaction of this judgment upon execution, and finding that the company was insolvent, the plaintiff brought this suit to compel the stockholders to pay what he claims to be due and unpaid on the shares of the capital stock held by them, alleging that he had frequently applied to the officers of the company to institute a suit for that purpose, but that under various pretences they refused to take any action in the premises.

By its charter the minimum capital stock was fixed at $100,000, divided into 1000 shares of $100 each, with power to increase it from time to time, by a majority vote of the stockholders, to two million and a half of dollars. The charter provided that the subscription to the capital stock might be paid "in such instalments, in such manner and in such property, real and personal," as a majority of the corporators might determine, and that the stockholders should not be liable for any loss, or damages, or be responsible beyond the assets of the company.

Previously to the charter, the corporators had been engaged in mining operations, conducting their business under the name and title which they took as a corporation. Upon obtaining the charter, the capital stock was paid by the property of the former association, which was estimated to be of the value of $100,000, the shares being divided among the stockholders in

proportion to their respective interests in the property.    Each stockholder placed his estimate upon the property; and the average estimate amounted to $137,500.    This sum they reduced to $100,000, inasmuch as the capital stock was to be of that amount.

The plaintiff contends, and it is the principal basis of his suit, that the valuation thus put upon the property was illegally and fraudulently made at an amount far above its actual value, averring that the property consisted only of a machine for crushing ores, the right to use a patent called the Crosby process, and the charter of the proposed organization; that the articles had no market or actual value, and, therefore, that the capital stock issued thereon was not fully paid, or paid to any substantial extent, and that the holders thereof were still liable to the corporation and its creditors for the unpaid subscription.

If it were proved that actual fraud was committed in the payment of the stock, and that the complainant had given credit to the company from a belief that its stock was fully paid, there would undoubtedly be substantial ground for the relief asked.    But where the charter authorizes capital stock to be paid in property, and the shareholders honestly and in good faith put in property instead of money in payment of their subscriptions, third parties have no ground of complaint. The case is very different from that in which subscriptions to stock are payable in cash, and where only a part of the instalments has been paid.    In that case there is still a debt due to the corporation, which, if it become insolvent, may be sequestered in equity by the creditors, as a trust fund liable to the payment of their debts.    But where full paid stock is issued for property received, there must be actual fraud in the transaction to enable creditors of the corporation to call the stockholders to account.    A gross and obvious overvaluation of property would be strong evidence of fraud.    *Boynton* v. *Hatch*, 47 N. Y. 225 ; *Van Cott* v. *Van Brunt*, 82 N. Y. 535 ; *Carr* v. *Le Fevre*, 27 Penn. St. 413.

But the allegation of intentional and fraudulent undervaluation of the property is not sustained by the evidence.    The

patent and the machinery had been used by the corporators in their business, which was continued under the charter. They were immediately serviceable, and, therefore had to the company a present value. The corporators may have placed too high an estimate upon the property, but the court below finds that its valuation was honestly and fairly made; and there is only one item, the value of the chartered privileges, which is at all liable to any legal objection. But if that were deducted, the remaining amount would be so near to the aggregate capital, that no implication could be raised against the entire good faith of the parties in the transaction.

In May, 1874, the company increased its stock, as it was authorized to do by its charter, to $1,000,000, or 10,000 shares of $100 each. This increase was made pursuant to an agreement with one Howes, by which the company was to give him 2000 shares of the increased stock for certain lands purchased from him. Of the balance of the increased shares, 4000 were divided among the holders of the original stock upon the return and delivery to the company of the original certificates — they thus receiving four shares of the increased capital stock for one of the original shares returned. The other 4000 shares were retained by the company. The land purchased was subject to three mortgages, of which the plaintiff held the third; and the agreement was that, under the first mortgage, a sale should be made of the property, and that mortgages for a like amount should be given to the parties according to their several and respective amounts, and in their respective positions and priorities.

The plaintiff was to be placed by the company, after the release of his mortgage, in the same position. Accordingly he made a deed to it of all his interest and title under the mortgage held by him, the trustee joining with him, in which deed the agreement was recited. The company, thereupon, gave him its mortgage upon the same and other property, which was payable in instalments. The plaintiff also received at the same time an accepted draft of Howe's on the company for $1000. When the first instalment on the mortgage became due, the company being unable to pay it, he took its draft for

the amount, $3000, payable in December following. It is upon these drafts that the judgment was recovered in the Court of Common Pleas of Philadelphia, which is the foundation of the present suit. It is in evidence that the plaintiff was fully aware, at the time, of the increase in the stock of the company, and of its object. Six months afterwards, the increase was cancelled, the outstanding shares were called in, and the capital stock reduced to its original limit of $100,000. Nothing was done after the increase to enlarge the liabilities of the company. The draft of Howes was passed to the plaintiff and received by him at the time the agreement was carried out upon which the increase of the stock was made; and the draft for $3000 was for an instalment upon the mortgage then executed. The plaintiff had placed no reliance upon the supposed paid-up capital of the company on the increased shares, and, therefore, has no cause of complaint by reason of their subsequent recall. Had a new indebtedness been created by the company after the issue of the stock and before its recall, a different question would have arisen. The creditor in that case, relying on the faith of the stock being fully paid, might have insisted upon its full payment. But no such new indebtedness was created, and we think, therefore, that the stockholders cannot be called upon, at the suit of the plaintiff, to pay in the amount of the stock, which, though issued, was soon afterwards recalled and cancelled.

*Judgment affirmed.*