PRESTON *et al. v.* CINCINNATI, C. & H. V. R. Co. *et al.*

*(Circuit Court, S. D. Ohio, W. D.* August 28, 1888.)

1. CORPORATIONS—STOCKHOLDERS—LIABILITY TO CREDITORS—FRAUD.
    Defendant H., being the owner of a railroad, organized a company to whose stock he was the only actual subscriber, some shares being issued to others at his instance, and sold his road to the company at a price about 15 times its value, taking in payment the stock and bonds of the company. To pay a debt he owed complainants, H. sold them a portion of the bonds, amounting to about three times the value of the road, upon which bonds judgment was rendered against the company. Complainants had refused to receive the road itself, or the capital stock, in payment of their debt, and the sole object of the organization of the company was to make use of the road in the payment of the debt; but whether complainants knew that fact was doubtful. *Held,* that the stockholders were liable, respectively, for the payment of said judgment, to the amount of their subscriptions, in spite of a provision in said bonds that no stockholder should be individually liable therefor.

2. GAMING—GAMBLING CONTRACTS—EVIDENCE.
    Evidence that an alleged indebtedness was a balance resulting from dealings on the board of trade in margins on wheat is not sufficient to prove the transaction a gambling one.

In Equity. Creditors' bill against stockholders.

Bill in equity by Josiah W. Preston and others against the Cincinnati, Columbus & Hocking Valley Railway Company, and E. L. Harper and others, stockholders of said company, to compel the payment by the stockholders of their subscriptions, and to apply the same to the satisfaction of a judgment in favor of the complainants against said company.

*Francis A. Riddle, Boyce & Boyd, Paxton & Warrington,* and *Otto Gresham,* for complainants.

*Jordan & Jordan* and *Taft & Lloyd,* for respondents.

SAGE, J. This is a creditors' bill to subject the amount due to the defendant railway company from the defendant E. L. Harper and his codefendants upon their subscriptions to the capital stock of said company, to the payment of complainants' judgments against said company, amounting to $255,938.48. The railway company was incorporated and organized in the latter part of the year 1881. On the 10th of December of that year defendant E. L. Harper subscribed for 2,500 shares of its capital stock of the par value of $100 each, and caused eight co-defendants —as he states in his answer—to subscribe for one share each, to enable them to become directors. Subsequently certificates representing 3,000 shares of the capital stock were issued by the company to defendant W. D. Lee, at the special instance and request of defendant E. L. Harper, and for his use and benefit. No money was paid upon any of the subscriptions, nor for the 3,000 shares issued to Lee for account of Harper, but they were regarded by him and by the company as fully paid for in the manner following: At the date of the organization of the company Harper was the owner of a narrow-gauge railroad which had been bought from an insolvent railroad company by purchasers who sold it to him, as he testifies, for "about scrap-iron price." It was some 20 miles in

length, had never paid operating expenses, and was worth just about what the rails, which were light and worn, would bring for scrap-iron. On the 13th December, 1881, at the first meeting of the board of directors, Harper submitted a proposition in writing to broaden the gauge of this road to standard gauge, and extend it on the west to the Little Miami Railroad, at a point near Corwin, and on the east to Jeffersonville, on the Springfield Southern Road, say about 30 miles of railroad, and to sell the same to the company for $1,800,000 of the par value of the securities of the company, as follows: $600,000 of its first mortgage bonds, $600,000 income bonds, and $600,000 of the capital stock, "including subscriptions already subscribed." A motion to accept this proposition, subject to ratification by the stockholders of the company, was promptly made and unanimously carried. Harper testifies that it was agreed with all the directors and all the stockholders, before the company was organized, that nothing was to be paid in cash upon the stock subscriptions, and that the directors "were to assist in the organization, or be promoters in this enterprise," for the purpose of enabling him to carry out his contract of October 12th with J. W. Preston & Co. and others, to organize said company, to change the gauge of his railroad to standard gauge, to extend the road as hereinbefore stated, to convey it to said company, to cause the company to issue its first mortgage bonds for an amount not to exceed in the aggregate $20,000 per mile of the length of the road and its extensions, and to issue income bonds not to exceed in amount the limit named for the first mortgage bonds, and to deliver to said J. W. Preston & Co. and others, in payment of their respective claims against him, $214,906 of said first mortgage bonds, and $107,453 of said income bonds. The judgments upon which complainants' bill is based were obtained upon bonds delivered by Harper in pursuance of said agreement, the bonds by their terms having become due by reason of the default of the company to pay the interest thereon. Upon the 2d of January, 1882, at a special meeting of the stockholders, all being present, the proposition made by Harper to the company, as above, was unanimously accepted. The only stockholders besides Harper were his co-defendants, who, at his instance, subscribed each for one share of the stock. with the understanding that they were to pay nothing for it, and that they were to become directors, and carry into effect Harper's plans and purposes, already stated. Harper widened the gauge of the road to standard gauge, extended it to the points named in his proposition, and conveyed it to the company, and the company issued and delivered to him the bonds specified; but, as the proposition recited that it was based on 30 miles of road, and the total length of the road was but 28 miles, the issue of bonds was $560,000 first mortgage and $560,000 income bonds.

The condition of the road is best stated by Ralph Peters, superintendent of the Little Miami Railroad, an experienced and thoroughly competent railroad manager. In August, 1883, his company having been solicited to operate the road, he, with his general manager, passed over and inspected the entire line. He testifies that they "found a very poor road,—badly constructed, with heavy grades, only temporary work in

the culverts and trestles; the embankments were narrow, and the cuts very narrow, the ditching in bad shape. It had been originally built as a narrow-gauge road. The gauge was widened out, the rails having been spread on the narrow-gauge ties, a few standard-gauge ties being put in, probably six to each rail, the balance of the ties under each rail being the original ties that were put in when the road was first constructed as a narrow-gauge. * * * The rail that was laid on that road was from thirty to forty pounds. It was entirely too light for the traffic of a standard-guage road; that is, for the cars and locomotives of a standard-gauge road. They had no water stations, no station-buildings that amounted to anything, and seemed to have little or no business. * * * The trestles all seemed to be in good condition. They had been overhauled by parties who had reconstructed the road, but they were too light for any heavy traffic. The culverts were of timber. Many of them had been washed out or had caved in, and were only repaired with old ties." He further testifies that the only thing valuable about the road were the rails and material, and that it was worth, "as a railroad enterprise, or business venture for the purpose of making or earning money to its owners," not more than $2,000 per mile, or about the scrap-iron value of the material in it; but to anybody "wanting to keep it as a railroad it was worth at least $4,000 per mile." The $2,000 per mile valuation might properly be regarded as the correct one, but for the purposes of this case it may be taken at $4,000 per mile, or $112,000 for the entire road. As a consideration for the transfer of this property to the company, being its entire line of road, Harper actually received $550,000 of the capital stock of the road, $560,000 of its first mortgage bonds, and $560,000 of its income bonds. It goes without saying that the entire transaction was grossly fraudulent from first to last, without a single honest incident or redeeming feature.

The complainants charge that Harper is indebted to the company for the 2,500 shares of the capital stock for which he subscribed, and for the 3,000 shares issued to the defendant Lee for his use and benefit, and they pray that this indebtedness may be subjected to the payment of their judgments. In *Branch* v. *Jesup*, 106 U. S. 468, 1 Sup. Ct. Rep. 495, it was held that a railroad company having authority to purchase a railroad may pay for the same in paid-up stock. "But," says the supreme court of the United States in *Coit* v. *Amalgamating Co.*, 119 U. S. 343, 7 Sup. Ct. Rep. 231, "where full-paid stock is issued for property received, there must be actual fraud in the transaction to enable creditors of the corporation to call the stockholders to account. A gross and obvious overvaluation of property would be strong evidence of fraud." There is no doubt that the defendant railroad company had authority to purchase Harper's road; and, this being so, the authorities cited make it clear that the complainants are entitled to the relief sought, unless the defenses made by and on behalf of Harper—all the other defendants who have been served with process being in default—are well taken.

Harper's defense is that the contract of October 12th was a contract of compromise and settlement with the complainants, fully performed on

his part; that the bonds were received by complainants in satisfaction of their claims against him, and with knowledge of the manner in which he had fulfilled his contract with the railway company, and of the entire history of the transaction; that complainants' judgments were rendered on said bonds, and that the stock issued to Harper was the only stock subscribed for, or issued by the railway company. Pending this suit Harper became insolvent, and made a general assignment in favor of his creditors. Thereupon his assignee was, upon his motion, made a defendant, and filed an answer, setting up that the sole consideration for the claims against Harper upon which said bonds were delivered by him to the complainants was a gaming transaction in the form of a deal in options in wheat at Chicago, in which there was no wheat actually owned, or bought or sold, but only a betting on future prices, and that the complainants won from Harper more than $600,000, on which he paid in cash or its equivalent not less than $400,000, and that complainant's claim was for the pretended balance of said winnings. For the amount so paid by Harper the assignee, by cross-bill, prays for decree and judgment.

Waiving all technical questions made with reference to these pleadings, the short answer to both is that there is absolutely no testimony in the record in support of either the answer or the cross-bill. Harper testifies that the parties claimed, "after absorbing some four hundred thousand dollars in cash of margins on wheat in Chicago," that he owed them a balance of over $200,000, which he disputed, but finally settled and compromised. On the examination of Preston, he was asked by Harper's counsel whether the consideration claimed to have been received by Harper for the bonds which he agreed to transfer to complainants did not grow out of dealings between Harper and complainants on the Chicago board of trade. To the question complainants' counsel objected, and instructed the witness not to answer, and he did not answer. He was not pressed, but Harper's counsel stated, as appears by the record, that he proposed to show that the contracting parties had dealings on the Chicago board of trade; that the books of the complainant would not show the amount claimed; "that the entire transaction was disputed and repudiated by Harper as fraudulent;" that the claim was exaggerated; and that it was in settlement of this fictitious claim that he compromised with complainants. This is all that appears in testimony, or that it was proposed to show. Taking it altogether, it falls short of what is required to establish that complainants' claims arose from a gambling transaction. *Irwin* v. *Williar*, 110 U. S. 499, 4 Sup. Ct. Rep. 160.

In support of Harper's defense, *Coit* v. *Amalgamating Co.*, 119 U. S. 343, 7 Sup. Ct. Rep. 231, is cited. But in that case the court found that there was no intentional and fraudulent undervaluation of the property in payment for which the stock of the company was issued; and the court said that, "Where the charter authorized the capital stock to be paid in property, and the shareholders honestly and in good faith put in property instead of money, in payment of their subscription, third parties have no ground of complaint." But here neither Harper's contract

with the complainants, nor his contract with the defendant company, was performed honestly or in good faith. From the testimony of Peters, hereinbefore quoted, and from all the circumstances of the transaction, it is clear that his pretended performance of his contract to broaden the gauge of the road and extend it to the *termini* named, was nothing but a sham and pretense; and his organization of the defendant company "under the laws of Ohio," which, as construed by the supreme court of the state, require that stock subscriptions be paid in money or its equivalent, was no better. The complainants must be presumed to have relied upon a faithful performance of his contract with them, which was, in effect, to convert the road into a standard-gauge road, and to organize a railroad company, which should have an existence in fact as well as in name. But it is claimed that complainants knew when they entered into the contract with Harper that he was to have all the stock of the company, as well as all the bonds, as the consideration for the transfer of the road. Harper so testifies, but the complainants Preston and McHenry, who conducted the negotiation, deny it. There are other witnesses who testify on the subject. The evidence is conflicting. It is true that Harper, in his negotiation for settlement, proposed to complainants to deliver to them a block of the capital stock of the new company, but they declined, for the reason—which is significant in its bearing on the defense that complainants placed no reliance on the capital stock—that they were not willing to incur the risk of the individual liability which the laws of Ohio imposed upon stockholders. He had before that offered them his entire road in settlement, but, after making inquiry as to its condition and value, they declined to take it. It was worth no more than the rails would bring for scrap-iron, or, in other words, than what Harper paid for it. Put these facts, which are not in dispute, together, and they seem to me to solve all doubts that the correct conclusion to be drawn from the testimony is that they understood that the stockholders of the new company were to be subject to the liabilities imposed by the law of Ohio, namely, full payment in money or its equivalent, and, in addition, 100 per cent. individual liability, and that they did not understand that they were to accept less than fourth-tenths of the first mortgage bonds, and less than two-tenths of the income bonds of the new company, secured by mortgage upon a railroad—which they had refused to take entire in settlement—so wretchedly improved as to have, at the expiration of 18 months after its completion, an actual value no greater than it had when Harper bought it, to-wit, what the iron would sell for as scrap. This conclusion sweeps away the defense, and results in the finding that the complainants are entitled to a decree, with costs. The decree will be against all the defendants excepting George Clymer, who was not found, and Lewis Seasongood, against whom there is no evidence that he was a stockholder. I have not referred to the amended bill and the answer thereto, (which did not, in my opinion, bring any new issue into the cause,) nor to the fact that some of the complainants were not parties to the contract with Harper, but took their bonds by assignment before maturity, because, in the view taken of the cause, it was not necessary to do so. The decree will also

be in favor of the intervening petitioners Martin Erwin and Alfred Sully, bondholders. The provision in the bonds that no stockholders shall be individually liable thereon for principal or interest does not exempt stockholders from the subjection of their contractual indebtedness to the company to the payment of its creditors holding judgments obtained upon such bonds, but it does refer to the stockholders' individual liability; which is statutory, and not sought to be enforced in this cause.