## VALUATIONS OF PROPERTY GIVEN IN PAYMENT FOR CORPORATE STOCK.

[Circuit Court of Erie County.]

R. D. KUNZ ET AL v. NATIONAL VALVE CO. ET AL.

Decided, April 13, 1907.

*Corporations—Liability for Unpaid Balance of Stock Subscription—Where Property at an Over-Valuation was Given in Exchange for Stock—Not Actual Value, But Good Faith Controls—Where Valuation was not Constructively Fraudulent—Gates v. Stone Co., 57 O. S., 60, Analyzed—Intent—As Among the Parties Making the Exchange—And as to Those Subsequently Dealing with the Corporation—Elements Entering Into a Fair Valuation—Effect of the Laws of Trade—Capitalization not the Basis of Credit—Substitution of Trustee—Burden of Proof—Equity—Laches.*

1. An action by the creditors of a corporation to ascertain the amount of unpaid balances of stock subscriptions, on which subscriptions payment had been made only with property at an alleged over-valuation, and to compel payment of such balances when ascertained, is appealable; and the right of appeal is not affected by the substitution of a trustee in bankruptcy for such creditors.
2. The holder of stock of a corporation, for which property was accepted in payment at an over-valuation of such property, is not liable to creditors of the corporation for the difference as an unpaid balance, where the transaction was made in good faith and the over-valuation was not so gross as to be constructively fraudulent.
3. The burden of proof rests on a plaintiff, asserting that property has been taken by a corporation in payment for stock at a fraudulent over-valuation, to establish that fact.

H. L. Peeke, representing the plaintiffs, cited and commented on the following authorities: *Andres v. Morgan,* 62 Ohio St., 60; Morawetz, Corporations, Sections 1, 227; *Chicago & G. T. Ry. v. Miller,* 91 Mich., 166; *Des Moines Gas Co. v. West,* 50 Iowa, 16; *Booth v. Bunce,* 33 N. Y., 139; *State v. Standard Oil Co.,* 49 Ohio St., 137; *Bennett v. Minott,* 39 Pac. Rep., 997; *First Nat. Bank v. Trebein Co.,* 59 Ohio St., 316; *Hathorn v. Calef,* 69 U. S., 10; *Ochiltree v. Railway,* 88 U. S., 249; *Norris v. Wrenschall,* 34 Md., 492; *Brown v. Hitchcock,* 36 Ohio St., 667; *Sutliff v. Atwood,* 15 Ohio St., 186; *Johnson v. Underhill,* 52 N.

Y., 203; *Hodgkinson* v. *Kelly*, L. R., 6 Eq. Cas., 496; *Cape's Executor's Case*, 2 DeG. M. & G., 562; *Mexican & S. A. Co., In re*, 4 DeG. & J., 544; *Kinsey* v. *Cable Co.*, 6 C. C.—N. S., 345.

Mr. Peeke contended that if a person accepts stock issued to him as a gratuity and the corporation becomes insolvent the law will create a promise to pay for it, and cited: *Handley* v. *Stutz*, 139 U. S., 417; *Upton* v. *Tribilcock*, 91 U. S., 45; *Sanger* v. *Upton*, 91 U. S., 56; *Chubb* v. *Upton*, 95 U. S., 665; *Pullman* v. *Upton*, 96 U. S., 328; *Morgan County* v. *Allen*, 103 U. S., 498; *Hawkins* v. *Glenn*, 131 U. S., 319; *Graham* v. *Railway*, 102 U. S., 148; *Richardson* v. *Green*, 133 U. S., 30; *Union Mut. Life Ins.* v. *Manufacturing Co.*, 97 Ill., 537; *Fogg* v. *Blair*, 139 U. S., 118; *Clark* v. *Bever*, 139 U. S., 96; *Kinsey* v. *Cable Co.*, 6 C. C.—N. S., 345; *Camden* v. *Stuart*, 144 U. S., 104; *Rickerson Roller-Mill Co.* v. *Foundry & Mach. Co.*, 75 Fed. Rep., 554.

The authorities cited as to the true value were: 10 Cyc., 472, 473, 474; *Ford* v. *Lamson*, 17 C. C., 539; *Kulp* v. *Fleming*, 65 Ohio St., 321; *Wick Nat. Bank* v. *Bank*, 62 Ohio St., 446; *Scofield* v. *Oil Co.*, 6 C. C.—N. S., 169.

As to payment for shares on personal liability for stock standing in name of one as trustee: 5 Cyc., 378; 10 Cyc., 460, 461, 463, 464, 797, 799; *Price, In re*, 92 Fed. Rep., 987; *Scovill* v. *Thayer*, 105 U. S., 143; 10 Cyc., 697; Cook, Stockholders, Section 503c; *Holcomb* v. *Gibson*, 39 Bull., 380; *National Tube-Works Co.* v. *Gilfillan*, 124 N. Y., 302; *Alling* v. *Wenzel*, 133 Ill., 264; *Coleman* v. *Howe*, 154 Ill., 458; *Van Cleve* v. *Berkey*, 143 Mo., 109; *Boulton Carbon Co.* v. *Mills*, 78 Iowa, 460; *Hastings Malt. Co.* v. *Brewing Co.*, 65 Minn., 28; *Wallace* v. *Manufacturing Co.*, 70 Minn., 321; *Lloyd* v. *Preston*, 146 U. S., 630; *Home Life Ins. Co.* v. *Fisher*, 188 U. S., 726; *Parmelee* v. *Price*, 208 Ill., 544; *Commercial Bank* v. *Warthen*, 119 Ga., 990.

As to who may complain of the transaction: *Rickerson Roller-Mill Co.* v. *Foundry & Mach. Co.*, 75 Fed Rep., 554; *First Nat. Bank* v. *Mining Co.*, 42 Minn., 327; 2 Morawetz, Corporations, pars. 832, 833; *Coil* v. *Amalgamating Co.*, 119 U. S., 343.

Intentional overvaluation of the property is actual fraud: *Lloyd* v. *Preston*, 146 U. S., 630; affirming, *Preston* v. *Railway*,

36 Fed. Rep., 54; *Coit* v. *Amalgamating Co.,* 119 U. S., 343; *Northwestern Mut. L. Ins. Co.* v. *Real Estate Co.,* 46 Fed Rep., 22; *Boynton* v. *Hatch,* 47 N. Y., 225; *Boynton* v. *Andrews,* 63 N. Y., 93; *National Tube-Works Co.* v. *Gilfillan,* 124 N. Y., 302; *Crawford* v. *Rohrer,* 59 Md., 599; *Wetherbee* v. *Baker,* 35 N. J. Eq.,* 501; *Coleman* v. *Howe,* 154 Ill., 458; *Peninsular Sav. Bank* v. *Stove Polish Co.,* 105 Mich., 535; *Shickle* v.*Watts,* 94 Mo., 410; *Garrett* v. *Mining Co.,* 113 Mo., 330; *Gilkie* v. *Town & Gas Co.,* 46 Neb., 333; *Osgood* v. *King,* 42 Iowa, 478; *Wishard* v. *Hansen,* 99 Iowa, 307; *Salt Lake Hardware Co.* v. *Milling Co.,* 13 Utah, 423; *Elyton Land Co.* v. *Warehouse & Elevator Co.,* 92 Ala., 407; *Boulton Carbon Co.* v. *Mills,* 78 Iowa, 460; *First Nat. Bank* v. *Mining Co.,* 42 Minn., 327.

A. B. Thompson, representing R. B. Fisher, cited as to the nature of the remedy: Thompson, Corporations, Sections 3429, 3432, 3493; Cook, Corporations, Sections 204, 206; *First Nat. Bank* v. *Peavey,* 69 Fed. Rep., 455; 20 Enc. Pl. & Pr., 703, 704, 710, 724; *Wellington* v. *Construction & Imp. Co.,* 52 Hun., 408; *Ryan* v. *Jacques,* 103 Cal., 280.

As to liability of one holding stock as trustee: *Holcomb* v. *Gibson,* 39 Bull., 380; *Biggio* v. *Sandheger,* 8 N. P., 13; Beach, Corporations, Section 136, Subd. H. See also 2 Morawetz, Corporations (2d Ed.), Section 852; Thompson, Corporations, Sections 3193, 3194; Cook, Corporations (4th Ed.), Sections 245, 246; *Wadsworth* v. *Laurie,* 164 Ill., 42; *Grew* v. *Breed,* 51 Mass., (10 Met.), 569; *Pullman* v. *Upton,* 96 U. S., 328, 330.

As to liability of defendants for unpaid stock subscriptions: 10 Cyc., 473, 474; *Gates* v. *Stone Co.,* 57 Ohio St., 60; *State Tr. Co.* v. *Turner,* 111 Iowa, 664; *Dean* v. *Baldwin,* 99 Ill. App., 582; *Clevenger* v. *Moore,* 58 Atl. Rep., 88 (N. J.); *Rumsey Mfg. Co.* v. *Kaime,* 173 Mo., 551; *Hastings Malt. Co.* v. *Brewing Co.,* 65 Minn., 28; *Van Cleve* v. *Berkey,* 143 Mo., 109; *Coleman* v. *Howe,* 154 Ill., 458, 471, 472; *Boynton* v. *Andrews,* 63 N. Y., 93; *Alling* v. *Wenzel,* 133 Ill., 264, 265; *National Tube-Works Co.* v. *Gilfillan,* 46 Hun., 248; affirmed, *National Tube-Works Co.* v. *Gilfillan,* 124 N. Y., 302; *Choteau* v. *Dean,* 7 Mo. App., 210; *Garden City Sand Co.* v. *Crematory Co.,* 205 Ill., 42; *Donald* v.

*Smelting & Refin. Co.*, 62 N. J. Eq., 732; *Holcomb* v. *Gibson*, 39 Bull., 380; Thompson, Corporations, Section 3194; Cook, Corporations, Sections 245, 246; *Hospes* v. *Manufacturing & Car Co.*, 48 Minn., 174; *Wallace* v. *Heating Mfg. Co.*, 70 Minn., 321; *Jackson* v. *Traer*, 64 Iowa, 469; *See* v. *Heppenheimer*, 61 Atl. Rep., 844 (N. J.); *Wetherbee* v. *Baker*, 35 N. J. Eq., 501, 502.

WILDMAN, J.; HAYNES, J., and PARKER, J., concur.

Appeal from Erie Common Pleas Court.

This case presents, first, the question of the appealability of an action instituted by a creditor of a corporation to compel the payment of claimed unpaid balances upon stock issued for overvalued property, and to subject the amount of such balances from stockholders to the payment of the debts of the corporation, in which case a trustee in bankruptcy has been substituted for the original creditor plaintiff, or has been permitted to come in and litigate the questions involved in the case.

At an early stage of the action we indicated our impression that the case here presented is appealable in Ohio, notwithstanding the decision of the Supreme Court in the case of *Smith* v. *Johnson*, 57 Ohio St., 486. That was an action in which a receiver appointed to wind up the affairs of a corporation brought suit below to recover unpaid subscriptions to the capital stock of the corporation, and it was held that despite the fact that several stockholders were brought in who raised no question of misjoinder, it was in effect an action in which the remedy sought was a recovery of money, and that it was a case triable to a jury and not appealable.

There was no question there, as there is in the case before us, as to the effect of the taking by a corporation of property in lieu of money as payment upon stock subscriptions, or of the issues arising upon a suit by a creditor to subject any interest still owned by the corporation in balances of the price of stock over and above the value of the property received by the corporation in assumed full payment of the subscription price.

The question is one not free from difficulty, but our view of the whole matter is, that the present case demands an accounting after an ascertainment of the question of the liability of stock-

holders to respond to the claims of the plaintiff, assuming, of course, for the moment, that there be any liability on the part of such stockholders, and that as among all concerned equity requires an adjustment of such liabilities among the stockholders and an ascertainment of the amount of unpaid subscriptions, if any, requisite to meet the legitimate demand of creditors for the payment of debts.

We think, then, that the case is appealable, and as we entertained that impression from the time of our first examination of the matter, we have very fully heard the case upon its merits, giving some days' time to its trial, and since its submission to us as much time as was possible for the consideration of the legal questions involved and very able arguments and briefs of counsel. As to the written briefs, I will say that at the cost of some night work they have all been carefully examined and we think that no important questions or propositions submitted by counsel on either side have been overlooked.

The National Valve Company, a defendant here, was organized under the laws of this state in October, 1903, with an authorized capital stock of $75,000, $65,000 of which was issued, and all to one stockholder, J. G. Schurtz. It was a sort of successor to an earlier corporation known as the Vincent Valve Company, which had been unfortunate in business and whose affairs had come under the control of a trustee in bankruptcy. The Vincent Valve Company, the earlier corporation, was organized under the laws of Michigan and in the year 1899 was brought to this city of Sandusky and entered upon business here. It acquired real estate here, by donation, I think, from the chamber of commerce, and established a plant and for several years conducted its business. In the year 1903 it had accumulated an indebtedness of some $130,000—$100,000, or about that sum, being due to the president of the company, the said Mr. J. G. Schurtz, and some $20,000 to the Third National Exchange bank of this city. A suit was instituted by the bank, and the company's property placed in charge of a receiver appointed by the court of common pleas of this county. He was subsequently, in proceedings in bankruptcy in the federal court, appointed a receiver therein and the property for a time remained under his management as such.

During 'the summer of 1903 efforts were made for the re-organization of the new company, citizens of this city deeming it of importance that the plant be retained here and the business of the company continued, and among the gentlemen forwarding this project were some citizens well known to the members of the court, men of character and business ability. Some of them were attorneys at this bar; one of them was a former member of this court. As the result of all their efforts a new company, the present defendant, was organized and incorporated under the laws of Ohio, and the assets of the Vincent Valve Company were transferred at private sale by the trustee in bankruptcy to John G. Schurtz, the principal creditor of the former concern, as I have already stated, and its president. Immediately thereafter the stock of the National Valve Company to the amount of $65,000 was issued to Mr. Schurtz.

Schurtz had made certain arrangements with the Third National Exchange bank, which I will not stop to recite, in the nature of a sort of application upon its claim, which was a preferred claim upon this property, of $20,000 worth of bonds of the National Valve Company to be issued. The National Valve Company, October 26, 1903, I think, not only issued its stock to the amount of $65,000 to John G. Schurtz, but also $20,000 worth of bonds. These bonds were turned over to the Third National Exchange bank to be applied upon its claims. Its original claims against the Vincent Valve Company had been changed into a claim for loans or advances made to Mr. Schurtz himself, to the amount of some $26,000 or $27,000, which had enabled him to carry out the program formulated by the promoters of the new organization. For the further protection of the bank, a large block of the stock so issued to Mr. Schurtz was transferred by him to Mr. F. P. Zollinger, an officer of the bank, as trustee. This block of stock was to an amount sufficient to give Mr. Zollinger the absolute control of the new company in any stockholders' meeting. By a contract which had been entered into between him and Schurtz, he was to receive 51-100ths of the total stock, and in fact received 380 shares from Mr. Schurtz out of the 650 shares issued by the company to Schurtz. A part of this so received by Zollinger, however, was for services

rendered by him and deemed by Mr. Schurtz of sufficient value to justify the transfer to him of a portion of the stock so received by Mr. Schurtz from the valve company.

The new company issued its bonds to the amount of $40,000, inclusive of the $20,000 so delivered to the Third National Exchange bank, but of the remaining $20,000 so issued only $16,000 were ever disposed of, and it was, as we find, in the contemplation of the parties that said $16,000 in bonds were to go into assets of the new company to furnish additional machinery in part and to reinforce or establish a working fund for the furtherance of its business. I may have omitted some of the details from this general statement, but sufficient has been said to show the general nature of the transaction, an understanding of which is necessary to an intelligent consideration of the questions raised by the pleadings.

The vital question in the case is the one presented by the claim of the plaintiff creditors, and subsequently by the trustee in bankruptcy, that the property received from Schurtz by the National Valve Company was grossly overvalued; that it was not worth the face value of the stock issued to Schurtz, added to the amount of the bonds which he received. This presents a question of fact upon which we have received a large amount of evidence. Connected with this are some legal questions which have been very interesting to us and which perhaps, have not yet been determined by the courts of this state. That under the adjudication in Ohio stock is not necessarily to be deemed fully paid, although it may so state upon its face, and although it may be so declared by resolution of the directors of the company, is substantially undisputed here, and, indeed, it could hardly be disputed in view of some of the decisions of the Supreme and other courts of this state.

The main controversy is, whether the property turned over to the corporation by Mr. Schurtz is to be taken as of its actual value at the time it was so transferred, or as of its understood and believed value by the parties then dealing with it, Schurtz on the one hand and the corporation on the other. The diversity of view entertained by the courts called upon to consider this question for many years and in many jurisdictions has led to

the recognition in some jurisdictions of what is called the "true-value rule" and in others of the so-called "good-faith rule." It is agreed by counsel in the case, who have made very careful research along the lines here involved, that there is this diversity of view among the courts of the different states. And it is also agreed that even in those jurisdictions where the so-called "good-faith rule" prevails, there is recognized as sometimes appearing in transactions of this character such gross overvaluations of property delivered or transferred to a corporation in payment of stock subscription as to constitute, although actual fraud be lacking, a constructive fraud upon other stockholders not so favored and upon creditors of the corporation.

It is contended by the plaintiffs that the rule which makes a transfer of property apply as payment for subscribed stock only to the actual value of the property, is the rule which obtains in Ohio, and much emphasis is placed upon the case of *Gates* v. *Stone Co.*, 57 Ohio St., 60, in support, as it is claimed, of this proposition. It is urged, also, in behalf of the plaintiffs, that if this rule does not obtain in Ohio, still in the case at bar there was such a gross overvaluation of the property as consistently with the good intent and good faith of the officers of the corporation and Mr. Schurtz will present a case of constructive fraud as against creditors.

On the other hand, it is claimed that the good-faith rule is the rule towards which the courts in the different jurisdictions are rapidly tending; that the overwhelming weight of authority will support transactions of this kind in which both parties act in absolute honesty, endeavoring to fix a real value upon the property transferred to the corporation in payment of stock subscriptions. The defendants insist that this rule has not been repudiated in the state of Ohio by the case of *Gates* v. *Stone Co.*, *supra*, or any other decision of the court of last resort; but they urge that even if the rule contended for by counsel for the plaintiffs is correct, still the property transferred by Mr. Schurtz to the National Valve Company was, considering all conditions and circumstances, of an actual value equal to the par value of the stock received by him, plus the $20,000 of bonds.

A very careful analysis of the case of *Gates* v. *Stone Co., supra,* does not disclose a holding by the Supreme Court that where the grantor and the grantee of property are in error as to its actual value and the property is received by a corporation in payment for stock issued ostensibly as "full-paid stock," it can be treated as only partially-paid stock if the property turns out to be not worth the estimate placed upon it by the parties so dealing with it. This Gates case does treat the question of good faith, but it is the question of good faith as applicable to the intentions of the parties with reference to others in the matter of fraud. The case was referred in the court below to Judge Pennewell, of Cleveland, as a referee, and after the hearing of evidence he found that property had been turned out to the corporation at double its real value. No exceptions were filed to his report upon this point, no objections made to the finding that the property was received by the corporation at twice its actual value, so that the case presented itself to the Supreme Court as one in which that was a determined issue. There was no finding, so far as appears in the report, what the parties at the time of the transfer believed the property to be worth; and the Supreme Court simply hold in substance that when parties receive a credit for twice the value of the property turned out to a corporation in payment for a stock subscription, they are not relieved from liability to pay the residue of the price by reason of the fact that they had confidence in the future prosperity of the company and that they had no intention to defraud either stockholders or future creditors. I think that that is the spirit and substance of the decision of the Supreme Court in the Gates case. But it does not anywhere appear in the case that the grantor or grantee of the property—by the grantee I mean the corporation acting through its officers—believed that the property was worth the par value of the stock. No claim of that kind seems to have been made in the case.

We are not to confuse the two kinds of intent here—the one the intent to defraud persons who may dwell with the corporation or who may become stockholders in it, and the other the intent as among themselves to make an inflated but not necessarily fraudulent estimate of the value of the property. When the

courts of some jurisdictions have mentioned the good-faith rule they have referred to the estimate of the value of the property in good faith by the persons making it. The Supreme Court in the Gates case, when it is talking about honesty, or good faith, is considering the intention of the incorporators and the stock subscriber as to those with whom they are subsequently to deal, and who may rely upon the capitalization as a basis of credit.

Passing now from this case, which we think does not determine the question in dispute between the parties here, we have discovered no decision in Ohio upon which we are disposed to rely which settles the question, whether what is known as the true-value rule or the good-faith rule should apply to transactions of this kind and determine whether stock is full-paid or whether it is not.

It would be a labor of very great difficulty and hardly warranted at the present time to attempt a review of the multitudinous adjudications along these lines in other states and in England; but I think that I may not unprofitably read from 1 Cook, Corporations, Section 46, wherein he discusses the principle involved in these disputes and states his view as to the current of authority. I read:

"A dissenting stockholder may object to such an issue, inasmuch as it decreases the value of his stock."

That is, an issue of stock for property where the property is, in fact, overvalued.

"He may have the transacttion set aside, and the person receiving the stock compelled to return it."

That would be futile as a means of giving relief to anyone here, because the stock has become, I suppose, substantially worthless, the company having become bankrupt after conducting business for about a year from October 28, when the National Valve Company issued this stock to Schurtz. The writer continues:

"Corporate creditors, however, are the persons who generally complain. The company becomes bankrupt and they are not paid. They then find that the capital stock did not represent cash; it was paid for by property taken by the corporation at a valuation

much greater than its real value. The company being insolvent and its property gone, the corporate creditors seek to hold the stockholders liable. They seek to hold the stockholders liable for the par value of the stock, less the real value of the property which was turned in to the corporation. During the past twenty years there has been a vast amount of litigation on this subject. The courts still disagree in their conclusions, but a careful study of the cases will show that upon authority as well as principle the stockholders can not be held liable in such a case. In England and New York they can not be held liable at all, except on the basis of a rescission. And under all the well-considered decisions they can not be held liable unless the property was of so trifling a character that it practically has no value whatever. This class of cases has arisen under two aspects; first, at common law, and, second, under statutes.

"At common law it is well settled that corporate creditors can not hold stockholders liable on stock which has been issued for property, even though the property was turned over to the corporation at an agreed valuation which was largely in excess of the real value of the property. There have been cases which refuse to follow this rule, but it is clearly established by the great weight of authority."

I am not reading all this and treating it as the law of Ohio, but only as the expression of this writer and compiler and for its indication of the trend of authority in the different states of this country and in England, and also for his discussion of the reasons which may support the one rule or the other.

I continue the quotation:

"The reason of the rule is, that if the payment by property was fraudulent, then the contract is to be treated like other fraudulent contracts. It is to be adopted *in toto*, or rescinded *in toto* and set aside. Both parties are to be restored as nearly as possible to their original positions. The property or its value is to be returned to the person receiving the stock, and he must return the stock or its real value. In New York and in England, as stated above, at common law the stockholder is not liable at all to corporate creditors, even though the overvaluation was gross and clearly known so to be. The remedy is rescission, and not the making of a new contract by the court. There are other cases, however, which hold that where the property so turned in had no substantial value, or where the overvaluation was 'fraudulent,' the court will hold the stockholders liable for the par value of the stock, less the value of the property. Still other cases

hold that where the stock has no value when it is issued for property, the creditors are not deprived of anything and hence can not complain. 'If, when disposed of by the railroad company, it was without· value, no wrong was done to creditors.' Such is the language of the Supreme Court of the United States.''

I stop for a moment in the reading of the text to refer to the decision in *Coit* v. *Amalgamating Co.*, 119 U. S., 343, affirming *Coit* v. *Amalgamating Co.*, 14 Fed. Rep., 12, cited in a foot-note by Cook, where this question, he says, clearly arose, and—

, ''The court said that the creditors could not hold the stockholders liable unless there was an intentional and fraudulent overvaluation. The court said that, 'Where full-paid stock is issued for property received, there must be actual fraud in the transaction to enable creditors of the corporation to call the stockholders to account; a gross and obvious overvaluation of .property would be strong evidence of fraud.' ''

I ,have already said, and it seems to be conceded by counsel for the defendant, an overvaluation may be so gross as to constitute not simply strong evidence of fraud but to constitute constructive fraud and become just as binding upon the parties, so far as fixing liability is concerned, as if it were actual fraud. I read further from the note:

''The court held that although a machine and a license to use a patent were put into the company for $100,000 of stock, yet there was no fraud. The lower court said corporators 'ought not to be made liable individually for the debts of the company at the instance of creditors, because, at a later day, the estimates fairly put upon the property at that time have become modified by subsequent events, and will not amount to the value which they set upon it.'.''

In other words, the Supreme Court seems to be holding that the reliability of the estimate or the honesty of the persons dealing with the property can not be affected by conditions subsequently arising, matters not known to them at the time when they fixed the value. I read further from the text:

At the common law ''there is no contract, express or implied, to pay to the corporation or to corporate creditors the par value of stock which is issued for property. Not only is there no such

contract, but there is no implied fraud even though the property was overvalued. If there is express fraud the law provides ample remedies, but such a fraud must be clearly proven and is not implied from the proof that the property was worth less than the par value of the stock. This principle of law, that there is no liability on stock issued for property the value of which is, less than the par value of the stock, seems a self-evident principle of law. Moreover, this principle is based on business usage and is sound practice. There is no more harm in the issue of stock below par than there is in the issue of a note or bond below par. The extent to which the courts have gone in sustaining such issues of stock for property is shown by the fact that even constitutional and statutory prohibitions against watered stock have been practically construed away by the courts. Moreover, the laws of trade are more powerful than the laws of men, and in business circles it has become customary to capitalize property at a reasonably high figure. This is due to the fact that it is easier to sell stock at less than par than at par, and also to the fact that, by a large capitalization, dividends are kept low enough to avoid the cupidity of possible competitors and the interference of Legislatures. To such an extent is this practice carried of issuing stock for property at an overvaluation, that the investing public and persons who give credit to corporations rather expect it, and they no longer rely upon the nominal capitalization of the company. Experience has taught them that they must investigate the real financial condition of the company, and invest or give credit upon that alone.

"Even the fact that a person to whom the stock is issued returns a part of it as a gift to the corporation or to trustees for the corporation to sell the same below par and put the proceeds in the corporate treasury for a working capital does not necessarily prove fraud in the value put upon the property. The person receiving the stock may have been willing to sacrifice a part of his stock and property in order to make the rest more valuable. Shares which have been forfeited after being partly paid for may be reissued at a price equal to the unpaid subscription price or any sum in excess thereof."

After some further discussion of the question, the writer continues, in the same section:

"There is a limit beyond which the courts will not go in sustaining the issue of stock for property taken at an overvaluation. If the property which is turned in is practically worthless, or is unsubstantial and shadowy in its nature, the courts will hold that there has been no payment at all, and that the stockholders are liable on the stock.

"Moreover it is to be borne in mind that the parties receiving watered stock may be liable as promoters to return 'profits which they have made. This is particularly the case where the promoters merely owned an option which they have sold to the corporation at an exorbitant price.

"The remedy of the corporate creditor is in equity. An action at law for conspiracy is difficult to maintain. The liability on stock issued for property at an overvaluation commences only upon insolvency of the corporation. Hence the statute of limitations runs from that date, or from the date when judgment is obtained against the corporation. Laches may be a bar to the collection of what is claimed to be due on watered stock."

I have read nearly the whole of this section, which is a very long one, because there is so much treatment in it of the principles upon which these rules are based on one side or the other— the principles, perhaps, I should rather say, which call for the adoption of some rule applicable to cases of transfer of property in exchange for stock and the resulting liabilities thereunder.

I have been much impressed in the reading of this section with the view expressed that creditors do not to-day rely upon the amount of the capitalization of the company in giving credit to a corporation to the extent that they did at some former period of our history, and the rule upon which even the decision in *Gates* v. *Stone Co., supra,* is based, is only, that to permit property to be put in at a gross overvaluation would be a fraud upon creditors who might rely upon the capitalization of the company. It seems to have escaped some of the courts, that where a company has remained in business for many years and its circumstances have greatly changed, where it has had either a profitable or an unprofitable business, the amount of its capitalization ceases to be, if it ever was, a safe criterion as to the strength of the company. That matter does not seem to be referred to in these cases, but the discussion is all upon the ap-

parent theory, that the amount of the capitalization of the company is a sort of an asset for the protection of creditors, as if the money which had been paid in for stock had remained unexpended—undisturbed, during all the vicissitudes of its business.

I am strongly of the opinion that the amount of capitalization of a company affords little basis for an estimate of the financial strength of the company. We have many companies whose profitable business has made them strong financially where their capitalization is very small, and we have others whose capitalization reaches into the millions and no one pretends to rely upon that fact as a basis of credit or an estimate of the actual financial strength of the company.

The recent promotion of numerous speculative companies of enormous capitalization, where the property was, as known to everyone, vastly less in value, is illustrative of the fact that no especial reliance is placed upon authorized capitalization or upon the amount of stock issued at its nominal or par value. I am suggesting all this not in any effort to repudiate the doctrine which has been established by the court of last resort of the state of Ohio, but only as explanatory of my own view that we ought not to go very much further in holding stockholders to a technical liability based upon a legal fiction. It is the judgment of this court that the "good-faith rule" should prevail in Ohio. It has not heretofore been established by any Ohio adjudication; but we believe it to be the rule more consonant with justice and more consistent with the established principles adopted in all other cases of claimed fraud. The good faith of the parties in such cases is made the test of the validity of the transaction, except where the circumstances raise so strong a legal inference as to constitute constructive fraud.

As a question of fact, however, and lest we may be wrong in the opinion which I have expressed, we have considered the evidence bearing upon the question of the real value of the property taken by the National Valve Company from Mr. Schurtz. At the outset of this inquiry we feel very clear in our judgment that values as fixed by sacrifice sales are not to be taken as the just rule to determine the value which parties dealing with

property, where the one is free to sell and the other is free to buy, should adopt. We think, as expressed in the case of *Coit* v. *Amalgamating Co., supra,* that incorporators are not to be held individually liable for the debts of the company at the instance of creditors because the estimates fairly put on the property at the time it was transferred to the company have been modified by subsequent events; and we think it equally true that the estimates which they place upon the property are not to be governed by prior forced sales of the property in a court of bankruptcy or upon execution from any court. It has been universally held that values are not so to be fixed, but that we are to determine the value of property by its worth in the market where the grantor is free to sell, and where the purchaser is free to buy.

A number of witnesses have given their judgment as to the value of this plant and all that appertained to it as transferred by Schurtz to the National Valve Company. I will not attempt to analyze their testimony in detail and I will touch upon it only to consider certain general principles that apply to it.

In one of the foot-notes to Section 46 of Cook, Corporations, from which I have read, at the bottom of page 126 of the first volume, I find this language:

"Inasmuch as the franchise, earning power or good will is generally turned in at a high valuation, it is well to state that the law sustains a fair valuation of the franchise," and he cites some authority in support of this. I have not gone off to any investigation of the question as to how far the note is borne out by the decisions, because I take it for granted; and I base my conclusion upon the result of prior examinations of adjudications not dissimilar in this respect, that there is attaching to property in Ohio as in other states, a something, intangible and yet not worthless, that may have grown up along with the use of the property in the course of years. It may be something that enhances the value of a shop or some other building where a business has been carried on for a long time until customers have learned to find their way to it. It may be something attaching to the quality of stock that is turned out by a particular manufacturing establishment. It may be something that pertains to

the honest and fair dealing of a merchant with his customers. In all of these instances we call it sometimes good will, sometimes we say nothing about it, but we judge the value of the property itself in the light of that circumstance taken in connection with other circumstances.

In the case at bar there may or may not have grown up a very valuable good will connected with this plant. So far as the real estate is concerned, I doubt whether it was made particularly more valuable by reason of the fact that the Vincent Valve Company had ever conducted its business there; but the men who have spoken as witnesses upon this question, at least those who have spoken in behalf of the defendants, have taken into account in their judgment of the value of the property the fact that it had been a going concern and that it was a part of their plan of operation to keep it such after the brief period in which it was in financial difficulty. From the month of June until the month of October it was in control of the courts. From the month of July until some time in the month of November very little, if any, business was done, and we are pointed to correspondence of the company with would-be purchasers of its product where the company was forced to turn down offers or inquiries as to its goods. The very fact that it had inquiries, the very fact that there were possible purchasers in the market who were interested in the plant and who were writing to the company and receiving responses are indicative of the fact that it had some sort of a trade which might be valuable to preserve. We have no doubt that this was one of the matters taken into account by the promoters of the new company and we think legitimately so. We have considered the various items of property involved in this transfer. We have noted the character of the witnesses testifying. We think that they are honest men upon both sides, that they gave their honest judgment as to the value of the property turned over.

It is urged by counsel for the defendants, and we have heard no adverse contention on the other side, that the burden of proof rests upon the plaintiffs to establish the claim that the property was taken at an overvaluation. To sum up the whole matter, it is our view, adopting this contention of the defendants, of the

correctness of which we have no doubt,. that the onus resting upon the plaintiffs has not been sustained by a preponderance of the evidence.  On the contrary, we think that the evidence preponderates in support of the claim made in behalf of the defendants that the stock under all the circumstances was worth what the corporation paid for it.  I am saying this in full view of the circumstance, thereafter occurring, that the business proved unprofitable, that the company failed, and that its affairs again went into bankruptcy or insolvency, but also in view of the unquestioned law that the persons engaged in the transaction were not held to prophetic vision.

Upon the question of good faith we are not to forget that no motive is apparent for any overvaluation of this property or overcapitalization  of the company.  They were not going out into the open market to hawk their ·stock about and sell it. There is no claim on the part of the creditors that anyone in fact relied upon the conduct of these men to his prejudice.  There is no syllable of evidence that any credit was given upon the basis of this claimed overcapitalization—I do not know that it would be essential; but, at any rate, in judging of the whole matter it seems to us that it is fair to take into account the absence of evidence that these defendants sought to obtain credit upon any claim of theirs that the assets of the company amounted to $85,-000 or any other particular sum.  The man who turned out the property to the company received all the issue of stock, every share of it.  No stock was sold by the company to anyone else, and in the whole transaction from its beginning to its unfortunate end, we find no evidence of anything which would fix a stigma on the character of the men who engaged in it, or which would render any one of them personally liable to respond to the claims asserted by the creditors.

Our judgment is, that the petition be dismissed.

*H. L. Peeke,* for plaintiffs.

*A. B. Thompson,* for R. B. Fisher.

*R. H. Williams* and *R. K. Ramsey,* for defendants,