## CAMDEN *v.* STUART.

## STUART *v.* GREENBRIER WHITE SULPHUR SPRINGS COMPANY

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF WEST VIRGINIA.

Nos. 159, 643.  Submitted January 18, 1892. — Decided March 21, 1892.

The trust arising in favor of creditors by subscriptions to the stock of a corporation cannot be defeated by a simulated payment of such sub-

scription, nor by any device short of an actual payment in good faith; and it was not intended, by anything said in *Clark* v. *Bever*, 139 U. S. 96; *Fogg* v. *Blair*, 139 U. S. 118; or *Handley* v. *Stutz*, 139 U. S. 417, to overrule this principle, or qualify it in any way, but only to draw a line beyond which the court was unwilling to go in affixing a liability upon those who had purchased stock of the corporation, or had taken it in good faith in satisfaction of their demands.

Applying this rule to the testimony and mass of figures in this case, the court affirms the judgments of the court below against stockholders in these cases, whose subscriptions for their stock in the corporation, defendant in error in No. 643, were shown to be in part unpaid.

There is always a presumption of the correctness of a master's report; and in view of the fact that no exception was taken to it by the plaintiff in error in No. 159, as required by Rule 21, the court does not feel bound to examine into the minor details of the report in this case, and holds that that presumption overrides any effort that has been made to show an error in this particular.

While the good-will of a business may be the subject of barter and sale, it must be something substantial, and capable of pecuniary estimation, and not shadowy.

THE court stated the case as follows:

These were appeals from a decree requiring the appellant Stuart to pay the sum of $18,937.08, and appellant Camden the sum of $9495.12, these being the amounts unpaid upon certain subscriptions made by them to the stock of the Greenbrier White Sulphur Springs Company.

The facts of the case were substantially as follows: On January 30, 1880, appellants Stuart and Camden and one George L. Peyton agreed to organize the Greenbrier White Sulphur Springs Company for the purchase of the White Sulphur Springs property, consisting of 7000 acres of land in West Virginia, and an interest in 2800 acres adjoining in Virginia, all of which was about to be sold under a judicial decree, rendered by the District Court of West Virginia. It was agreed that Stuart should purchase the property individually at a price not to exceed $310,000, (subsequently increased by agreement to $340,000,) and should sell the same to the corporation, when formed, for the sum of $390,000 and the expenses of the sale, ($16,000,) making an increase over the purchase price of $66,000. Camden was to take one-half

interest in the corporation, with the privilege of disposing of a part of his interest to other parties, and Peyton and Stuart each one-fourth interest. Stuart bought the property at the judicial sale for $340,000, and a charter was applied for and granted; but as the capital stock was put at $500,000, the company was not organized under this charter. The parties, however, took possession of the property and operated it as a watering place during the season of 1880, under the name of the Greenbrier White Sulphur Springs Company. On December 3, 1880, a new corporation was formed under the same name, with a capital stock of $150,000. A certificate was filed, reciting that the incorporators had paid in on their subscriptions $50,000, and desired the privilege of increasing the said capital by sales of additional shares to $1,000,000 in all. The capital so subscribed was divided into shares of $100 each, and held as follows; By Stuart, Peyton, and Henry M. Mathews, each 375 shares; by Camden, 188 shares; and by William P. Thompson, 187 shares.

On December 29, 1880, the incorporators met at the city of Baltimore; the certificate of incorporation was accepted as the charter of the company; the five stockholders elected directors, of whom Stuart was elected president; and by-laws were adopted for the government of the company. On the same day it was unanimously resolved to increase the capital stock of the company from $150,000 to $300,000, the certificates of said increase to be sold at par value, for the purpose of creating an improvement fund.

Immediately after this meeting of stockholders, they met as a board of directors, and "the stockholders were called upon to pay in their respective proportions of the $4000 heretofore agreed to be paid, and which when paid will be in full of the capital stock of $150,000 provided as full paid-up stock." On motion, "the president and secretary were authorized to issue to the various stockholders certificates to the amount of $150,000, of the capital stock of this company, in proportion to their respective subscriptions, and as in full payment of the same." The resolution adopted at the stockholders' meeting to increase the capital stock from $150,000 to $300,000 was

also adopted at this meeting. Several months afterwards the capital stock was by another resolution increased from $300,000 to $400,000.

The Springs property was turned over to the corporation by Stuart, though it was never formally conveyed to the corporation until March 17, 1882, when a deed was executed by Stuart and his wife for the expressed consideration of $390,194.44. It was expressly covenanted in this deed that a lien should be retained upon the property conveyed to secure the payment of the balance of the purchase money remaining unpaid. The corporation assumed the obligations of the copartnership, and continued the business as though no change had been made.

During the season of 1880 the copartnership claimed to have made $56,000 of profits, but the statement of the expert employed by the commissioner to whom the case was referred showed a net profit in that year of but $4251.68, and this without taking into consideration a large number of outstanding notes of the company. During the season of 1881 the balance sheet of the company showed a profit of a little less than $10,-000, while on December 1, 1881, there were outstanding notes of the company to the amount of $114,294.39. This sum did not include the open accounts of the company. On April 15, 1882, there were notes outstanding to the amount of $172,046.18. The season of 1882 was a failure, and early in the fall of that year the company collapsed, owing, including the vendor's lien, $891,862.16, as reported by the commissioner.

On February 9, 1882, at a meeting of the board of directors, it was ordered that coupon bonds to the amount of $200,000 be sold at not less than fifty cents on the dollar, and also $100,000 of stock be sold at par, the two, stock and bonds, to be sold together; that is, each purchaser of $100 worth of stock at par to take bonds to the amount of $200, at not less than fifty cents on the dollar; and that said bonds be secured by a deed of trust on all the property of the company, with the exception of a lot of not more than two acres near the depot. It was further ordered that the president take the necessary steps to get in the legal title of the company to the real estate; and that "the present stockholders shall have the privilege of

taking said stock and bonds in amounts proportioned to the stock now held by them, and should any of the stockholders decline to buy, then the others shall have the right to take their shares, and only in the event that any of said stock and bonds are not taken by the present stockholders they shall be sold to outside parties."

On April 6 the stockholders met at White Sulphur Springs and confirmed this action of the board; directed the president to execute a deed of trust to secure the bonds and interest to William W. Gordon and Isaac H. Carrington, trustees; and also fixed upon May 1, 1882, as the date when the option to take the stock and bonds reserved to the stockholders should expire. At a further meeting of the board of directors on April 25 this option was further extended to May 15. At a meeting on the following day it was further resolved that the president at his earliest convenience place in the hands of John P. Branch $50,000 of the coupon bonds of the company, and $25,000 of stock of the company, and that "he deliver to W. A. Stuart a like amount of the stock and bonds of the company, to be p ced or disposed of by them in accordance with resolutions heretofore adopted." Stuart received his $50,000 of bonds and $25,000 of stock, and paid for them with $50,000 of the obligations of the company, upon which he was individually bound as endorser, and which he had purchased at fifty cents on the dollar.

This litigation began on April 10, 1883, by a bill filed by Stuart against the Sulphur Springs Company and Gordon and Carrington, trustees, to enforce a sale of the property covered by the trust deed, in satisfaction both of his own claim, as holder of fifty thousand dollars of the bonds secured by such deed, and of such other claims and demands against the company as might be proved, in the order of their priority. He prayed for a reference to a commissioner to take an account of all the property of the company and the liens thereon, their amounts, character and priority, the names of the stockholders, the number of shares owned by each, the par value of the same, and the amount due and unpaid by each of the stockholders. He further prayed for a report of all the unsecured

claims and demands against the company, for a sale of the property, and that the proceeds be applied to the satisfaction of the liens thereon, and for a receiver.

Subsequently, and on September 3, 1885, William Knabe & Co. intervened in this suit by petition, claiming an indebtedness against the company of $518.63, and prayed to be allowed to contest the validity of the deed of trust, and have the property thereby conveyed subjected to the payment of all the debts of the company without preference, except for the debt due for the purchase money of the real estate, and that proper orders be made for the purpose of securing the rights of the creditors against the stockholders in respect to their subscriptions to the stock of the company. Petitioner also prayed that the trust deed be declared null and void, and the property subjected to the payment of the debts of the company.

By consent of parties the two cases were heard together, the deed of trust was decreed to be null and void, and the bill filed by Stuart dismissed. No appeal was taken from this order of dismissal. The court further ordered, upon the report of the special commissioner, the payment by Camden of $9495.12, and by Stuart of $18,937.08, as of December 30, 1880, to the Sulphur Springs Company, as the unpaid subscriptions to the capital stock of such company. From this decree both parties appealed to this court.

*Mr. J. Holdsworth Gordon* for Camden.

*Mr. Alexander F. Mathews* for Stuart.

*Mr. Tazewell Ellett, Mr. H. H. Marshall* and *Mr. Assistant Attorney General Maury* for the Greenbrier White Sulphur Springs Company.

MR. JUSTICE BROWN delivered the opinion of the court.

The single question involved in these appeals is whether the defendants Stuart and Camden can be called upon to pay in their proportions of unpaid subscriptions to the capital stock of the White Sulphur Springs Company.

The capital stock of this company was fixed at $150,000, and the certificate of incorporation of December 3, 1880, stated that $50,000 had been " paid in on said subscriptions."

(1) As to defendant Stuart.

Stuart's answer, in this connection, avers that "it is true, as stated in the application for the charter, that $50,000 of said capital stock had then been paid in, but in making said statement it was not intended to say that no more than that amount had been paid in, the fact being that prior to the date of said application (3d December, 1880) there had been paid up in cash, on account of the subscriptions to said capital stock, at least the sum of $70,000. Your respondent is under the impression that it was from $75,000 to $80,000. He knows that he had himself paid at least $17,500 on account of his own subscription, and the same amount on account of the subscription of his co-defendant, George L. Peyton, for whom he advanced the money, and he has no reason to doubt that the other stockholders put in like proportion on account of their subscriptions." He denied that any part of the subscription remained unpaid, and averred that full-paid shares had been legally and properly issued to the subscribers.

Mr. Gallaher, the master, to whom the case was first referred, reported upon this point as follows :

"Mr. Stuart states that between $75,000 and $80,000 had been paid in. Mr. Peyton states that on each $\frac{1}{4}$ there had been paid in about $17,500, or $70,000 in all. Mr. Stuart and Mr. Peyton state that the profits of the season of 1880 were, as shown upon the books, to have been $56,000. The theory was, these amounts having been paid in, together with the $4000, making in all cash $130,000 according to Mr. Peyton's calculation, and about $140,000 according to Mr. Stuart, the incorporators considered that they had a property with a paying and earning capacity of $56,000 the first year of their venture. The property had been improved, enlarged and was enhanced in value and reputation as a springs resort. They estimated that their time, labor and talents were worth something, and they determined to increase the stock $150,000 more, making it in all $300,000, and, as the witness Stuart states, were negotiat-

ing for such increased stock. They estimated another element of value, viz.: the long time their vendor had given them on the deferred payments. They estimated their assets as worth $150,000 and started business. It seems to me it was worth it at the time. The creditors seem also to have thought so when they dealt with them. Without further comment I report that all of the $150,000 original stock was paid up."

Upon the argument of exceptions to this report, it was ordered that it be referred to Mr. Leake, another master residing at Richmond, who reported upon the same subject as follows:

"Prior to the formation of the company the corporators had paid into the business of the 'Greenbrier White Sulphur Springs Company,' as it did business in 1880, the sum of $50,000, and this money had been expended in permanent improvements and furniture, etc., and composed a part of the assets of the concern at the end of the year 1880. . . . On December 30, 1880, a call was made for $5000 from Stuart, Peyton, Mathews, Thompson and Camden jointly, and they paid these calls at once, except as to H. M. Mathews, who only paid $4000, thus making in all $69,000, or money, or money's worth, actually paid in on account of said stock subscription."

He then recites the resolution of December 30, calling upon the stockholders to pay in their proportions of the $4000, heretofore agreed to be paid in full of the capital stock of $150,000, and that authorizing the president and secretary to issue certificates for that amount, and says:

"These resolutions were based upon an erroneous balance sheet or statement of the business of the parties called the Greenbrier White S. S. Co. for the year 1880, by which it was made to appear that there had been made a profit of $80,000 by said business during that year, which with the $70,000 paid in said business and to be paid in to the company, would have made an input of $150,000, the amount of said stock.

"But said statement was far from correct. Instead of a profit of $80,000, the real profit for the said year 1880 was only $4251.68.

"I report, therefore, that the original subscribers to the stock have paid in and owe still the following sums:

"1. Wm. A. Stuart subscribed for 375 shares.....$37,500 00
　　Paid in old business..............$12,500 00
　　　"　　company.................　5,000 00
　　His fourth of profits.............　1,062 92
　　　　　　　　　　　　　　　　　　　　　　18,562 92

　　　　　　　"Balance due by him..............$18,937 08
"2. Geo. L. Peyton for like sum................. 18,937 08
"3. H. M. Mathews for like sum and an additional
　　　$1,000, as he only paid $4,000 on the $5,000
　　　called................................... 19,937 08
"4. J. N. Camden on his 180 shares paid in like pro-
　　　portion and owes in like manner...........　9,495 12
"5. W. P. Thompson on his 187 shares paid in like
　　　manner and owes in like manner..........　9,441 96

　　　　　　"Total indebtedness..............$76,748 32

"And this should bear interest from Dec. 30, 1880, when it was held out to the world as having been paid in.

"Each of the original subscribers is bound for the unpaid part of his subscription. The capital stock was afterwards increased under the resolutions under which the deed of trust of April 6, 1882, to Carrington and Gordon, trustees, was executed; but I have already reported in regard to the stock issued thereunder."

It will be observed in connection with these reports that the two masters to whom these cases were referred agreed substantially in holding that about $70,000 was paid in on the capital stock, Stuart's proportion of which would be $17,500, and that their divergence of opinion arose over the alleged subsequent payments. Mr. Gallaher reported in regard to these that the $56,000 of profits of the season of 1880 should be treated as a part of the capital stock, and this, with the $4000 and the $70,000 originally paid in, would make $130,000 cash subscriptions, and upon that theory found that

the entire capital stock had been paid in. Before the second report was made the question of this $56,000 of profits was referred to an expert accountant, who reported that the real profits of the year 1880 were only $4251.68, Stuart's proportion of which was $1062.92.

It is very difficult to ascertain from the mass of figures and testimony upon this subject the exact status of this company at the close of the year 1880, when the corporation was organized. It does, however, appear very clear that, conceding that $70,000 in money had been paid into the capital stock of the company, and $56,000 of profits had also been realized, there was less than $1200 in money remaining December 31, and in addition thereto there was a large increase of indebtedness during that year. Indeed from the beginning of the business in the spring of 1880, to its close in the autumn of 1882, there was a constantly increasing indebtedness.

Assuming that there was $70,000 paid in before the corporation was formed, which is $20,000 more than was claimed in the articles of incorporation to have been paid in, it is evident that, if it were paid in cash, it was immediately paid out for furniture, permanent improvements, etc., and that there was little, if any, money left at the end of the season. There is, then, a *prima facie* liability on the part of the defendants to pay each his proportion of the remaining $80,000 and the real question in this case is whether this has ever been paid or accounted for in such a manner as to operate as a satisfaction of the claim. In view of our decisions in *Sawyer* v. *Hoag*, 17 Wall. 610 ; *Scovill* v. *Thayer*, 105 U. S. 143, and the numerous cases arising out of the failure of the Great Western Insurance Company, it is manifest that the resolution adopted at the directors' meeting of December 29, 1880, that upon payment of $4000, or their proportions of the same, the capital stock of $150,000 should be deemed to be fully paid, was wholly ineffectual as against the creditors of the company. It is the settled doctrine of this court that the trust arising in favor of creditors by subscriptions to the stock of a corporation cannot be defeated by a simulated payment of such subscription, nor by any device short of an actual payment in good faith. And

while any settlement or satisfaction of such subscription may be good as between the corporation and the stockholders, it is unavailing as against the claims of the creditors. Nothing that was said in the recent cases of *Clark* v. *Bever*, 139 U. S. 96; *Fogg* v. *Blair*, 139 U. S. 118; or *Handley* v. *Stutz*, 139 U. S. 417, was intended to overrule or qualify in any way the wholesome principle adopted by this court in the earlier cases, especially as applied to the original subscribers to stock. The later cases were only intended to draw a line beyond which the court was unwilling to go in affixing a liability upon those who had purchased stock of the corporation, or had taken it in good faith in satisfaction of their demands.

It is, however, claimed that during the season of 1880, in addition to the real estate already purchased, there was furniture contributed to the amount of $53,834.78, and permanent improvements made to the amount of $42,000, making a total of over $95,000, which should be added to the $50,000 represented by the certificate of incorporation to have been paid into the company. No claim of this kind is made in Stuart's answer, and in view of the $70,000 which is said to have been paid in cash, it may be safely assumed that, if this money were paid at all, of which there seems to be some doubt, it went in this direction, and that, having been once credited to the subscribers in the form of money, it cannot be credited again in the form of assets for which this money was paid.

So far as concerns the profits of $56,000 claimed to have been made during the season of 1880, the evidence is very unsatisfactory. These profits were stated at this sum by the book-keeper of the concern under an instruction of the manager, to make out as good a showing as he could for them, to aid in the appreciation of the stock of the new corporation — a method of estimating profits which throws very considerable doubt upon the accuracy of the result. An expert accountant acting under the direction of the commissioner, after a careful examination of the books, found these profits to amount to $4251.68, which was allowed by the master in computing the amount due by the several parties upon their subscriptions.

A suggestion is made in the brief of Mr. Camden's counsel that the expert erred in charging certain items to the account of expenses, but in view of Rule 21 of this court, which requires that "when the error alleged is to a ruling upon the report of a master, the specification shall state the exception to the report and the action of the court upon it," we do not feel called upon to examine into the minor details of this report. There is a presumption of its correctness which overrides any effort that has been made to show an error in this particular.

The experience and good-will of the partners, which it is claimed were transferred to the corporation, are of too unsubstantial and shadowy a nature to be capable of pecuniary estimation in this connection. It is not denied that the good-will of a business may be the subject of barter and sale as between the parties to it, but in a case of this kind there is no proper basis for ascertaining its value, and the claim is evidently an afterthought. The same remark may be made with regard to the contract of January 30, and the loss of time and trouble to which the parties were subjected, which are now claimed to be elements of value in the property contributed to the corporation, but of which no account was made at the time.

(2) As to defendant Camden.

The answer of Camden to the bill or petition of Knabe & Co. averred that "the total cost of improvement, betterments and new furniture amounted to a large sum, of which there was paid in cash by the parties interested in said purchase about $70,000;" that the business yielded a net profit of about $56,000 for the season, which amount was also appropriated and devoted to the improvement and enhancement in value of the said property, the parties in interest having all given largely of their time and attention to the development of the said property without charge for the time, expenses and labor in connection with the same; "that the whole transaction was made in good faith, and, as he considered, a plain, legitimate business transaction; that the parties had full right to sell the property to the corporation at a fair and reasonable price to be agreed upon by respondent, and his co-purchasers

under the said contract were so advised by able counsel, and the resolution passed by the board of directors of said company making such purchase was prepared by John K. Cowen, their legal adviser, and was adopted and ratified by the said company in full directors' meeting, and ordered to be spread upon the records of said company." Annexed to his answer was a copy of this resolution, the original of which, he said, was filed with his deposition in a chancery suit in the Circuit Court of Augusta County, Va. By this instrument it appears to have been resolved:

"1. That in consideration of the transfer to this company of the contract with said W. A. Stuart, and also of all the improvements, furniture and personal property of all descriptions placed by said J. N. Camden and his associates upon said premises, this company do agree for the consideration aforesaid to accept the same in full payment of the unpaid balances by said J. N. Camden and on their several subscriptions to the capital stock of this company as set forth in the certificate of incorporation.

"2. Resolved, that when said transfer of the contract and property aforesaid is duly made to this company, there shall be issued to the parties named in the foregoing resolution certificates of fully paid up stock for the amount which they have respectively subscribed, as set forth in the certificate of incorporation aforesaid."

This resolution was annexed to the sworn answer of Camden, but is not shown to have been actually passed, is not made an exhibit in the case, and does not appear in the additional record stipulated into the case, which purports to contain a copy of the minutes of all the meetings of said company, and of the board of directors thereof.

It is somewhat singular, too, that this resolution, which Camden avers to have been adopted at the directors' meeting at Barnum's Hotel, in Baltimore, was not set up or proved by Stuart, to whom it was equally available, and did not make its appearance until December, 1887, more than four years after this suit was begun, after all the testimony had been taken, and within a few days before the case was finally sub-

mitted to the court for adjudication. It is absolutely inconsistent with the resolution adopted by the board on the same day, December 29, 1880, calling upon the stockholders to pay in their proportions of the $4000 agreed to be paid in full of the capital stock, and under the circumstances nothing can be claimed in virtue of it.

Defendant Camden also claims the right to set off as against his indebtedness upon the stock the sum of $10,284.56, paid by him in a suit against him and Stuart to recover the price of furniture in the hotel, of which the company received the benefit, and which furniture is a part of the property contributed to the corporation. This payment, however, added nothing to the assets of the company. The furniture itself was a part of such assets, and was taken into consideration when the valuation of December 3, 1880, was made, and it was held correctly by the court below that, "as he has already been allowed the value of that furniture in his original payment, to allow this claim would be to credit him twice for the same thing." If a person should buy upon credit a certain piece of property, such, for instance, as a steamboat, and should turn it over to a corporation and receive certificates of stock representing its value, it would scarcely be claimed that when he paid his original vendor he should receive additional stock to the amount of such payment. In this case Camden purchased the furniture, turned it over to the company, and is presumed to have received stock proportioned to his contribution.

We have been much embarrassed in the consideration of this case by the want of the assignment of errors required by Rev. Stat. sec. 997, and the twenty-first rule of this court, and should have felt ourselves justified upon that ground in refusing to take cognizance of the case. We have, however, examined the evidence so far as it bears upon the question of these defendants' liability upon their stock subscriptions, and have found it confusing and unsatisfactory. Indeed, the vital question whether the capital stock of this corporation was ever paid in money or money's worth is so covered up and obscured by a multiplication of figures and an entanglement of details that it is almost impossible to arrive at

the exact truth. From this testimony, however, one thing clearly appears, viz.: that the company was incorporated with a capital stock of $150,000, and that the stockholders were content to put a valuation of $50,000 upon what had been put in at the time the company was formed. As there was apparently no motive for underestimating this value, in the absence of clear proof to the contrary, the court would be justified in accepting it as the correct valuation of the property turned over to the company. *Coit* v. *Gold Amalgamating. Co.*, 119 U. S. 343. But, in view of the finding of the masters that $70,000 had been paid in we are content to accept this as the true amount. As no further assessments or calls appear by the minutes of the corporation to have been made, except the $4000 which was to be in full of the balance of the subscription, the burden of proof is upon the defendants to show how, if at all, the residue of this subscription was paid. The other fact, that the call of $4000 was made for the purpose of completing the subscription of $100,000, and to be in full thereof, indicates that the directors considered their entire duty in regard to the payment of the capital stock to have been discharged. We have already held that this payment of $4000 was unavailing as against the creditors' claims. If any further payments were made, defendants should make it appear clearly and satisfactorily. They failed to satisfy the master, to whom the case was referred. They failed to satisfy the court below. They have failed to convince us. In lieu of the evidence which the nature of the case required, they have presented us a complicated mass of testimony, and have asked us to evolve from it sufficient to support their theory that, in some manner, of which apparently they have no clear comprehension, these subscriptions were paid.

In cases of this kind, referred to a master to state an account, depending, as they do, upon an examination of books, upon the oral testimony of witnesses, and, perhaps, as in this case, upon the opinions of an expert, "his conclusions have every reasonable presumption in their favor, and are not to be set aside or modified unless there clearly appears to have been error or mistake on his part." This was the rule laid down

Opinion of the Court.

by this court in *Tilghman* v. *Proctor*, 125 U. S. 136, and approved in *Callaghan* v. *Myers*, 128 U. S. 617, 666, and in *Kimberly* v. *Arms*, 129 U. S. 512.   See also *Dean* v. *Emerson*, 102 Mass. 480 ; *McDonough* v. *O'Neil*, 113 Mass. 92.   We see no reason for departing from it, and think this is a proper case for its application.

Upon the whole, we agree with the Circuit Court upon the points involved in these appeals, and the decree of that court is therefore

*Affirmed.*