## In re L. M. ALLEMAN HARDWARE CO.

(District Court, M. D. Pennsylvania. August 25, 1909.)

(No. 920, in bankruptcy.)

1. CORPORATIONS (§ 88*)—LIABILITY OF STOCKHOLDERS—STOCK SUBSCRIPTIONS —PAYMENT IN PROPERTY—FRAUDULENT VALUATION.

The capital stock of a corporation is a trust fund for the benefit of creditors, and stock subscriptions are primarily payable in money, but may be paid in property contributed and accepted in good faith at a fair valuation. If, however, the valuation of the property is so extravagant as to make the transaction practically fraudulent, while it is good as between the corporation and stockholders who consent, it is not binding upon creditors, who have the right to assume that the stock stands for property of substantial value, and who presumptively deal with the corporation on that assumption.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 338, 342, 361; Dec. Dig. § 88.*

Stockholders' liability to creditors in equity, see notes to Rickerson Roller-Mill Co. v. Farrell & M. Foundry Co., 23 C. C. A. 315; Scott v. Latimer, 33 C. C. A. 23.]

2. CORPORATIONS (§ 76*)—CONTRACT OF SUBSCRIPTION TO STOCK—REQUISITES.

A formal subscription is not necessary to create a liability for stock of a corporation, but whoever accepts shares allotted to him undertakes to pay for them, if necessary to meet the demands of creditors; and, when the only payment that can be shown is by property fraudulently overvalued, he is not relieved from liability thereby.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 197; Dec. Dig. § 76.*]

3. BANKRUPTCY (§ 318*) — CORPORATIONS — CLAIM PROVED BY DELINQUENT STOCKHOLDER.

Partners who owned a mercantile business, the liabilities of which in fact exceeded the value of its assets, organized a corporation with an authorized capital stock of $50,000. They subscribed and paid for practically all of the $5,000 of stock necessary to be issued to comply with the law, and then made a contract with the corporation, through the other stockholders, by which it purchased from them the business and property of the partnership for $25,000, paying in cash the $5,000 received for the stock, and issuing to them $20,000 of stock for the remainder. One of the partners then, in accordance with a prior agreement, took over the stock and interest of the other and agreed to protect him from liability. The corporation was shortly after adjudged bankrupt, and such stockholder sought to prove a large claim against its estate for money lent. _Held_, that the entire transaction was clearly fraudulent, and that, having given no value whatever for his stock, he was liable to the estate therefor, and not entitled to the allowance of his claim until other creditors were satisfied.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 481; Dec. Dig. § 318.*]

In Bankruptcy. On exceptions to report of J. E. Vandersloot, referee.

See, also, 158 Fed. 119.

_____

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Allen C. Wiest, for exceptions.
John D. Keith and W. C. Sheely, opposed.

ARCHBALD, District Judge. The L. M. Alleman Hardware Company was incorporated under the laws of Pennsylvania in February, 1903, with an authorized capital of $50,000, on which 10 per cent.—$5,000—required by law was paid in, and stock issued for it accordingly, $2,400 to H. M. Gitt, $2,450 to S. L. Johns, and $50—one share each—to L. M. Alleman, George D. Gitt, and C. J. Spalding. The corporation was formed for the purpose of taking over the mercantile business of a partnership of the same name at Gettysburg, Pa., belonging to Johns and H. N. Gitt, which had in turn succeeded L. M. Alleman individually, under whose management it had been running at the same place since 1899, having almost from the beginning been involved in legal and financial difficulty. Johns and Gitt had been drawn in by loaning money to and indorsing for Alleman, and in July, 1905, were compelled to take over the business, after which it was run as a partnership, with Alleman in charge, with whom there was an understanding that he should have it back again when he was in shape to pay them. At the time of the incorporation the partnership was indebted on merchandise account and outstanding paper some $65,000 or $70,-000, and if forced into liquidation would have been hopelessly insolvent. The situation was so desperate, and Johns so dissatisfied with the management of Alleman, that he offered Gitt $10,000 to get out and be relieved from liability, and this was agreed to; Johns promising to remain for the time and assist in the organization of the company.

The company having secured its charter, at a meeting of the directors March 9, 1903, Johns and Gitt, in pursuance of their plans, submitted a formal offer to sell and transfer the partnership property and business for $5,000 cash and $20,000 common stock of the company; the company to assume the partnership liabilities, as well as the claims of Ebert & Son and Sargent & Co. against Johns and Gitt, growing out of their connection with the concern, which were then in litigation. By a statement which accompanied the offer, the assets were scheduled at $73,305.33, and the liabilities at $64,383.16, showing net assets of $8,922.17, which did not, however, take into consideration the claims of Ebert or Sargent. The offer as so made was accepted, and a check for $5,000 drawn in favor of Johns and Gitt, and a certificate for $20,000 of stock issued to them, half to one and half to the other. In the balanced statement of assets and liabilities entered upon the minutes in that connection, in addition to the figures just given, the capital stock was put in at $25,150, and the good will, on the opposite side, valued at $16,077.83; there being also $150 added to the accounts receivable to make things even.

That the balance so shown was a forced and fictitious one there can be no question. No one could honestly have believed that it correctly represented what it purported to. No allowance was made in it for a depreciation on stock, nor was anything deducted for bad debts; everything being put in at its book value. And neither was any account taken of the Sargent and Ebert claims, aggregating $11,000,

both of which were then in judgment, although one of them was subsequently thrown out, which, although to a certain extent contingent, could not be left out in the reckoning. But, more than that, the good will, which was put in at $16,077.83, and was absolutely necessary to justify the stock issue, was the purest fiction, for which we need go no further than the offer of Johns, referred to above, to give $10,000 to get out and be released, which Gitt accepted and subsequently exacted.

The new company thus started out with an admitted indebtedness of $64,000 (including a $500 over-draft) and contingent liabilities of $11,000 more, $5,000 of which it had very soon to settle for; and with nominal assets of $73,000, but after necessary deductions probably by several thousands short of that; and for this munificent bargain it parted with $5,000 in cash and $20,000 in stock, Johns and Gitt, in the $5,000 so paid them, getting back the very money which they had put in, to comply with the law, when the company was incorporated, this more than stripping it of its last dollar.

Burdened with this load, the company could not be expected to prosper, and did not. Gitt came to its rescue by indorsements; and it was helped out by a fire in March, 1906, from which $40,000 or $50,000 of insurance was realized. But Gitt got the most of this; the obligations of the company, on which he was liable, being reduced by means of it to $17,500. The company stocked up afterwards on credit, incurring merchandise debts of nearly $70,000, the most of which it is still owing. But, with the drain upon it, it did not last long; the present proceedings in bankruptcy being instituted in December following. The trustee has managed to realize $35,000 out of the assets, as against which there is an indebtedness, in round numbers, of $100,-000, included in which are two claims proved by Gitt for rent due, money advanced, and indorsed notes taken care of, the one for $18,-111.46 and the other for $2,982.67; and it is over these that the controversy arises. The contention is that the arrangement by which Gitt and Johns got $25,000 in cash and stock for the partnership assets was a fraud on creditors, who had a right to rely on the capital stock being representative of value; and that Gitt and Johns are in the position of having secured stock which they did not pay for, the amount of which they now owe to the trustee in consequence, the burden of this falling on Gitt as between him and Johns, Johns having turned over his stock to Gitt and being merely a nominal party; and that this excludes Gitt from participating in the bankrupt estate until he has paid up what he owes, or the other creditors have been put on an equality with him.

The capital stock of a corporation, as has been many times declared, is a trust fund for the benefit of creditors, which cannot be juggled with. Handley v. Stutz, 139 U. S. 417, 427, 11 Sup. Ct. 530, 35 L. Ed. 227. A stock subscription is primarily payable in money, but by arrangement may also be paid in property, contributed and accepted in good faith, at a fair valuation. This is expressly allowed by statute in Pennsylvania (Act April 29, 1874, § 17; P. L. 81), but would be good without that (Coit v. Gold Amalgamating Company, 119 U. S. 343, 7 Sup. Ct. 231, 30 L. Ed. 420), and is not open to objection,

unless there is such a discrepancy as to be practically fraudulent. American Tube Company v. Baden Gas Company, 165 Pa. 489, 30 Atl. 940; Pennsylvania Tack Works v. Sowers, 2 Walk. [Pa.] 416; Coit v. Gold Amalgamating Company, 119 U. S. 343, 7 Sup. Ct. 231, 30 L. Ed. 420. Nor does the holder become liable, as for unpaid stock, because' the statutory formalities have not been complied with. In re Duryea Power Company (D. C.) 20 Am. Bankr. R. 219, 159 Fed. 783. It is not open to creditors to take advantage of this, whatever may be said as to the state, or other stockholders. As between corporation and stockholder, also, a valuation, however extravagant, all parties consenting, is binding; but not as to creditors, who have the right to assume that the capital stock stands for property of a substantial value, and who presumptively deal with it on the strength of that. 'The corporation has no right to give away stock, without getting a fair equivalent, and where creditors are concerned an agreement that it should be treated as fully paid or nonassessable, or otherwise limiting liability thereon, is invalid. Handley v. Stutz, 139 U. S. 417, 11 Sup. Ct. 530, 35 L. Ed. 227; Camden v. Stuart, 144 U. S. 104, 12 Sup. Ct. 585, 36 L. Ed. 363. The Constitution of Pennsylvania expressly prohibits a fictitious issue of stock (article 16, § 7), as does the general corporation act following it. Act April 29, 1874; P. L. 73. And it offends against the law, where everything is problematical and prospective, and there is nothing to sustain the stock but an extravagant estimate of benefits to come. In re Wyoming Valley Ice Company (D. C.) 153 Fed. 787, Wiegand v. Lumber & Mfg. Co., 158 Fed. 608, 85 C. C. A. 430. A formal subscription is not necessary to create a liability for stock. Whoever accepts shares allotted to him undertakes to pay for them, if necessary, to meet the demands of creditors; and, when the only payment that can be shown is by property fraudulently overvalued, it is the same as no payment whatever. Handley v. Stutz, 139 U. S. 417, 11 Sup. Ct. 530, 35 L. Ed. 227; Camden v. Stuart, 144 U. S. 104, 12 Sup. Ct. 585, 36 L. Ed. 363; Elyton Land Company v. Birmingham Warehouse Company, 92 Ala. 407, 9 South. 129, 12 L. R. A. 307, 25 Am. St. Rep. 65. And this is true, because of the fraud, in bankruptcy, as well as elsewhere.

Applying these principles, which are well settled, the liability of Gitt for the $25,000 of stock, which he got without paying for it, is not open to question. The hollowness of the transaction, by which there was an apparent payment, appears upon the most casual consideration. It was not merely a case of excessive valuation, in which the parties were led away by an oversanguine view of the situation, if this would excuse it. The conditions were too plain and too fully understood to admit of any such misconception. There was nothing of substance to represent the stock, the good will being all, which practically had no existence. And with this taken out, while the capital stock had a nominal support of $9,000, of itself not enough to justify it, upon any fair adjustment of the other items even this was disposed of. The identity of the participants, also, is not to be lost sight of. It was Johns and Gitt as partners, on the one side, and Gitt and Johns, as the corporation, on the other, or rather Gitt alone on both; that being the effect of the arrangement between them. The fact that Johns and

Gitt withdrew from the meeting while the other directors, who had one share each, voted on the offer, was the merest formality, and deceived no one. Taking it altogether, the arrangement being a fraud on creditors, however good between themselves, the parties must account for the stock they got as though unpaid for.

The case is not like that of Sternbergh v. Duryea Power Company, 20 Am. Bankr. R. 625, 88 C. C. A. 482, 161 Fed. 540. The transaction there was a fair and honest one, entered into without any purpose to evasion; the patent rights turned over to the corporation in exchange for stock being of substantially the value assigned to them, and the mere failure to comply with the provisions of the Pennsylvania statute, mentioned above, with regard to the taking of property in payment of stock, not making the holders liable. But that is altogether different. Here the transaction was not fair. There was no value contributed for the stock received, and the parties knew it; there being a mere shuffling off of the affairs of an insolvent concern to escape further individual responsibility.

Being clearly liable, therefore, to the bankrupt estate, for the unpaid stock which he holds, Gitt has no right to come in on it until the other creditors have been satisfied. He may be entitled to set off his claims against his stock. But, conceding this right, and limiting his liability to the stock which he got direct, and not to that which was made out to Johns in the first instance, he would still have a far greater percentage than is in sight for other creditors; while, if he is held responsible for Johns' stock also, there would be considerable of a balance against him, and in either case the order of the referee postponing his claims is justified.

The referee was also of opinion that, taking advantage of his position as a director, Gitt got an unwarranted preference by the payment of obligations on which he was indorser, which he must therefore surrender. But, without entering upon that question, the other reason is sufficient, and the case may properly rest there.

The exceptions are overruled, and the order of the referee is affirmed, at the cost of the exceptant.