HITNER et al. v. DIAMOND STATE STEEL CO.

(District Court, D. Delaware. August 8, 1913.)

No. 260.

1. EQUITY (§ 409*)—REPORT OF MASTER—EFFECT GIVEN TO FINDINGS.

Where an equity suit is referred to a master to make findings by consent of the parties, his findings, so far as they involve questions of fact, if supported by any competent evidence, are conclusive on the parties. Where the reference is by the court, and not by consent, the same rule does not apply; but in such case the findings are presumptively correct, and are not to be set aside or modified, unless there clearly appears to have been error or mistake on the part of the master.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 904, 920–923; Dec. Dig. § 409.*]

2. EQUITY (§ 404*)—HEARING BEFORE MASTER—WEIGHT OF TESTIMONY.

The fact that the testimony of a witness before a master is uncontradicted does not require the master to accept it as true and treat the case as one of pure law.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 886–892; Dec. Dig. § 404.*]

3. RECEIVERS (§ 190*)—MANNER OF KEEPING ACCOUNTS.

It is the duty of receivers to keep their accounts with such fullness and particularity that the source of all receipts and the purpose of all expenditures may be clearly ascertained therefrom.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. § 381; Dec. Dig. § 190.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**4.** RECEIVERS (§ 99*)—ACCOUNTING—EXPENDITURES ALLOWABLE.

Receivers for a corporation are not entitled to credit in their accounts for expenditures made in an effort to reorganize the corporation or to effect a private sale of its property, when neither of such things was authorized by the court.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 183–186; Dec. Dig. § 99.*]

**5.** RECEIVERS (§ 83*)—MANAGEMENT OF PROPERTY.

While receivers are necessarily clothed with a considerable discretion in the management of the trust property, that fact does not excuse them for dealing with it carelessly or extravagantly.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. § 153; Dec. Dig. § 83.*]

**6.** RECEIVERS (§ 99*)—ACCOUNTING—SURCHARGING ACCOUNT.

Receivers *held* properly surcharged in their accounts by a master with expenditures made without authority.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 183–186; Dec. Dig. § 99.*]

In Equity. Suit by Henry A. Hitner and Joseph G. Hitner, trading as Henry A. Hitner's Sons, against the Diamond State Steel Company. On exceptions to master's report. Overruled, and report confirmed.

See, also, 197 Fed. 850.

Ward, Gray & Neary, of Wilmington, Del., for receivers.

William Clarke Mason, of Philadelphia, Pa., and Anthony Higgins, and Horace G. Eastburn, both of Wilmington, Del., for bondholders and creditors.

BRADFORD, District Judge. This case has been heard on exceptions taken, on the one hand, by James P. Winchester and Howard T. Wallace, receivers of the Diamond State Steel Company, hereinafter referred to as the steel company, and, on the other, by sundry bondholders and general creditors of that company, to the report of William G. Mahaffy, special master, to whom the accounts of the said receivers and certain matters relating to the adjustment, settlement and distribution of the estate of the steel company were referred. The order of reference to the special master was made July 27, 1910, in consequence of certain petitions filed in this case by the receivers, as follows:

(1) A petition filed June 20, 1910, for an apportionment of the expenses of the administration of the estate of the steel company between the funds arising from the sale of its real estate and its general assets; (2) a petition filed also June 20, 1910, for a further allowance to the receivers as compensation for them and their counsel; and (3) a petition, filed July 27, 1910, for the appointment of a special master to audit the accounts theretofore filed by the receivers, etc. On the day of the filing of the last mentioned petition Mahaffy was appointed special master, and it was ordered by the court as follows:

1. That said receivers shall forthwith file in this court their twenty-third and final account, [being subsequent to the accounts referred to in the last named petition] showing their receipts and disbursements since the date of

their twenty-second, being their last, report and account, and showing the net amount of money then remaining in their hands as receivers as aforesaid.

2. That William G. Mahaffy be and he is hereby appointed special master of this court, with the usual powers and for the following purposes:

(a) To audit the accounts of said receivers·now filed and of record in said cause, together with the account above provided for in this order. And it is further ordered by the court that said receivers shall forthwith file with said master all vouchers showing expenditures made by them as receivers during the term of their said receivership.

(b) To take evidence in respect of, to consider and state an account upon said petition praying for an apportionment of the expenses of said cause and receivership between the fund representing the proceeds of sale of the real estate and plant covered by the mortgage and bonds of said company and the fund constituting the general assets derived-from the balance of the estate of said company.

(c) To take evidence in respect of, to consider and report upon said petition of said receivers for an allowance to said receivers for their compensation and compensation of their counsel.

(d) To ascertain and report the docket and all other costs in said cause.

(e) To state an account showing the net amount of money belonging to the estate of said receivership after the payment of all proper expenditures therefrom in view of his findings upon the matters hereinbefore referred to him, and to state an account showing the distribution of said net balance of the funds of said estate among the persons entitled thereto.

(f) With all convenient speed to report his findings and awards upon the several subject-matters herein referred to him.

3. It is further ordered by the Court that the said master shall, before proceeding to hearings upon this reference, give public notice to all creditors, stockholders and bondholders of said the Diamond State Steel Company, and all other persons interested therein, by advertisement inserted in the Morning News, a daily newspaper published in the city of Wilmington, Delaware, once a week for four successive weeks, of the time and place of his commencing proceedings and hearings hereunder, and of the day on or before which all persons will be required to file exceptions or objections, if any, to the accounts of said receivers.

4. For the purposes of this reference the three above recited petitions of said receivers are referred to the said matter, together with the said reports, accounts and vouchers of said receivers.

After duly giving notice as required by the order the master proceeded with the taking of evidence, oral and documentary, touching the matters referred to him. The evidence is voluminous, filling between 3,400 and 3,500 typewritten pages, wholly aside from a large mass of documentary evidence consisting of books, vouchers and other papers. The taking of evidence began October 6, 1910, and was finished April 4, 1911, sessions for the purpose having been held by the master on forty-eight days. After the conclusion of the evidence the master proceeded to consider the same, hearing protracted arguments from counsel, consuming four full days. After laboriously considering the evidence in connection with the arguments, and ruling upon numerous objections taken to his draft report, not only by the receivers, but sundry bondholders and general creditors of the steel company, the master filed the same as his report, embodying therein his findings, conclusions and recommendations November 15, 1912. To the report as filed the receivers and the said bondholders and general creditors respectively filed exceptions in this court December 13 and 14, 1912. At the time appointed for the hearing of these exceptions, objection having been taken by the said bondholders and general creditors to the generality and form of the exceptions of the re-

ceivers, leave was asked and obtained to file amended exceptions on both sides. This was done by the general creditors March 3, 1913, and by the bondholders and receivers March 8, 1913. The amended exceptions contained certain specifications not set forth in any objections theretofore taken before the master to his report, and the same were referred to him for consideration, disposition and further report in connection with his original report filed November 15, 1912. Thereafter the master reported his findings and conclusions upon the amended exceptions April 4, 1913; and final argument was heard upon the master's report as amended in connection with the amended exceptions April 28, 1913, and the three succeeding days.

Generally speaking, and without going into details at this point, the master in his report concluded and recommended (1) that the unpaid taxable costs of this cause be apportioned equally between the fund representing the proceeds of sale of the real estate and plant covered by the mortgage and bonds of the steel company and the fund constituting the general assets derived from the balance of the estate of that company; (2) that the expenses of the administration of the estate of the steel company should be apportioned between the two above mentioned funds in manner as therein recommended. To the above two findings and recommendations no objection or exception has been interposed by anybody, and those findings and recommendations are unobjectionable. The master in and by his report further finds that the receivers be surcharged in their account in the sum of $21,467.85, representing credits claimed by the receivers for expenditures held by the master to have been improperly, unnecessarily and extravagantly made for wages and salaries, office expenses, rents, travelling expenses, and divers other items unnecessary to enumerate. And he further finds that the receivers are not entitled to compensation in the amount claimed for them by their counsel. July 6, 1907, they received for their own services and those of their counsel $25,-000, of which $6,250 was paid to their counsel; the remaining $18,750 being retained by them for their own benefit. In their petition of June 20, 1910, above referred to, they pray for a further allowance of "fifty thousand dollars or such other sum as to the court may seem proper" for the compensation of themselves and their counsel. The master finds and recommends that a total allowance of $37,000 be made to the receivers for compensation of themselves and their counsel, of which $20,000, including what they had retained for their own benefit as above stated, should go to the receivers, and $17,000, including what their counsel had already received as above stated should go to such counsel; the result being that were it not for the surcharges made by the master against the receivers they would receive in addition to the sum already paid to them for their own benefit the additional amount of $1,250, while they would receive for the benefit of their counsel the sum of $10,750, in addition to what they had already received for the benefit of such counsel. To the findings and recommendations of the master touching surcharges as above mentioned and his failure to find that the receivers were entitled to the amount of compensation claimed for them and their counsel, exceptions have been filed on the part of the receivers. On the other hand, the said bond-

holders and general creditors have excepted to the findings and recommendations of the master in that, as claimed, he did not surcharge the receivers in a sufficient amount, and also in that he allowed to the receivers for the benefit of themselves and their counsel a larger sum than was justifiable under the circumstances.

[1] A question which should be preliminarily disposed of relates to the conclusiveness or weight which attaches to the findings and conclusions of a master in chancery upon disputed questions of fact or mixed law and fact. On this subject a number of cases have been cited by the counsel for the respective parties. It is unnecessary to review them in detail. They recognize a clear distinction between a reference to a master by the consent of the parties, on the one hand, and, on the other, a reference to a master solely by the action of the court. In the former case the parties virtually constitute the master an arbitrator to decide between them and his findings on questions of fact or of mixed law and fact, where the testimony or other evidence is conflicting, unless under exceptional circumstances, are conclusive upon them. In Davis v. Schwartz, 155 U. S. 631, 15 Sup. Ct. 237, 39 L. Ed. 289, where the reference to the master was by the consent of the parties, the court said:

"As the case was referred by the court to a master to report, not the evidence merely, but the facts of the case, and his conclusions of law thereon, we think that his finding, so far as it involves questions of fact, is attended by a presumption of correctness similar to that in the case of the finding by a referee, the special verdict of a jury, the findings of a circuit court in a case tried by the court under Rev. Stat. § 649 [U. S. Comp. St. 1901, p. 525], or in an admiralty case appealed to this court. In neither of these cases is the finding absolutely conclusive, as if there be no testimony tending to support it; but so far as it depends upon conflicting testimony, or upon the credibility of witnesses, or so far as there is testimony consistent with the finding, it must be treated as unassailable."

Where the reference is by the court, and not through the consent of the parties, a different rule applies; the finding of the master on questions of fact carrying with it less weight than in the former case. It has been said that in such case the findings and conclusions of a master are merely advisory to the court leaving the case open to be determined by the court upon the weight of the evidence. The weight of authority, however, and the better reason clothe the findings and conclusions of the master with a presumption of correctness, not lightly to be disregarded. Unless in a clear case the findings and conclusions of the master based upon conflicting testimony and evidence should not be disturbed; for the witnesses, not appearing before the court, but testifying before the master, the latter is in a more advantageous position from personal observation of the witnesses, their demeanor and their manner of testifying, to form a reliable opinion of the weight of the testimony than the court, not enjoying such an advantage. Hence the findings of the master even where the reference is not by the consent of the parties are prima facie correct. Tilghman v. Proctor, 125 U. S. 136, 8 Sup. Ct. 894, 31 L. Ed. 664; Metzker v. Bonebrake, 108 U. S. 66, 2 Sup. Ct. 351, 27 L. Ed. 654; Callaghan v. Myers, 128 U. S. 617, 9 Sup. Ct. 177, 32 L. Ed. 547; Camden v. Stuart, 144 U. S. 104, 12 Sup. Ct. 585, 36 L. Ed. 363;

Cimiotti Unhairing Co. v. American Fur Refining Co., 168 Fed. 529, 93 C. C. A. 546.

In Tilghman v. Proctor, supra, the court said:

"We are then brought to a consideration of the exceptions taken to the master's report in matters of fact, affecting the accuracy of his conclusions in respect to the amount of those profits, gains and savings. In dealing with these exceptions, the conclusions of the master, depending upon the weight of conflicting testimony, have every reasonable presumption in their favor, and are not to be set aside or modified unless there clearly appears to have been error or mistake on his part."

In Camden v. Stuart, supra, the court said:

"In cases of this kind, referred to a master to state an account, depending, as they do, upon an examination of books, upon the oral testimony of witnesses, and, perhaps, as in this case, upon the opinions of an expert, 'his conclusions have every reasonable presumption in their favor, and are not to be set aside or modified unless there clearly appears to have been error or mistake on his part.' This was the rule laid down by this court in Tilghman v. Proctor, 125 U. S. 136 [8 Sup. Ct. 894, 31 L. Ed. 664]," etc.

In Cimiotti Unhairing Co. v. American Fur Refining Co., supra, the court of appeals for the third circuit, in 1909, approved the following proposition laid down by the court below:

"The well-settled rule is that the conclusions of a master on matters of fact have every reasonable presumption in their favor, and are not to be set aside or modified, unless there clearly appears to have been error or mistake on his part."

[2] But it is insisted by the counsel for the receivers that inasmuch as the receiver Wallace and Frank W. Todd have given oral evidence touching a number of material and important matters and transactions, and have not been directly contradicted or discredited by other oral evidence, their statements should have been deemed by the master absolutely true, and that he should have treated the case in so far as testified to by these witnesses without direct contradiction as one of law and not of fact. There is a palpable distinction recognized by the authorities and founded in reason between the force of the findings of a master on questions purely of law, on the one hand, and, on the other, questions purely of fact, or of mixed law and fact. This case is not included in the former class; for while the receiver Wallace and Todd have not been directly and categorically contradicted with respect to a number of facts and transactions of a material nature by the oral testimony of other witnesses, their testimony with respect to such facts and transactions has been shaken and largely discredited by divers proofs in the case, including not only papers and documents, but circumstantial evidence in the oral testimony of other witnesses. Not only so, but in a number of instances the circumstance that the books kept under the supervision of the receivers, and of the contents of which Wallace and Todd must be presumed to have had knowledge, fail to disclose facts and conditions testified to by them which had they existed would or should have been disclosed in the entries therein, further tends to render their testimony unsatisfactory and questionable. Nor does it necessarily follow that where oral testimony on one side of a case is wholly uncontradicted it must be accepted as true and the case treated as one of pure law. For those so

testifying may either be mistaken or testify falsely. The probability or improbability of their statements must be taken into consideration. A sworn and uncontradicted statement that the moon is made of green cheese, or that a witness had run a mile in a minute, cannot establish the truth of either affirmation as matter of law or, indeed, of fact. So, a plaintiff who gives uncontradicted testimony in support of a claim asserted by him is not as matter of law necessarily entitled to recover. I do not perceive any ground on which this case can be excepted from the general rule that a master's findings on disputed questions of fact are presumptively correct and should not lightly be set aside by the court.

But were it otherwise, the evidence in connection with the briefs of counsel and an independent examination of the law of the case, have satisfied me that the findings, conclusions and recommendations of the master were proper and that his report should not be disturbed.

[3] There are certain prominent features of the case strongly tending to establish neglect and mismanagement of the estate of the steel company by the receivers. In the first place from the manner in which they kept their accounts it is apparent that they did not adequately realize the obligations they had assumed as trustees for the bondholders and general creditors of the steel company. If there was one duty more incumbent upon them than another it was to keep or have their books and vouchers kept in such manner as to furnish an intelligible and perspicuous account of their acts and transactions in order that the bondholders and general creditors, as well as the court, might at any time as occasion required promptly and readily ascertain the true condition of affairs. But this to an inexcusable extent they failed to do. It is true that in the seventh paragraph of the original order of their appointment December 12, 1904, they were required to "make and file quarterly returns of their receipts and disbursements during their continuance in office," but in the same section it was also provided:

"That said receivers are hereby directed and required to keep proper books of account wherein shall be stated the earnings, expenses, receipts and disbursements of the said trust under this order of their appointment, and preserve vouchers for all payments made on account by them thereon."

It goes without saying that the quarterly returns of merely receipts and disbursements were wholly inadequate to furnish the data requisite for the final settlement and adjustment of the affairs of the steel company, and could not be deemed a compliance with the obligation resting upon them as trustees to keep proper books of account and vouchers as above stated. The fact that the quarterly accounts of the receivers largely failed to specify with particularity the items or classes of items for which expenditures were made, and the items or classes of items for which moneys were received by them, rendered it all the more important that the books and vouchers, in contradistinction to the quarterly accounts, should be full, detailed and explicit. Had their books and vouchers been properly kept the reference of July 27, 1910, would have entailed but little trouble and the consumption of but little time for the ascertainment and determination by the master of the matters submitted to him on the reference. But owing

to the failure of the receivers to make intelligible and sufficiently particular entries in their books of account and vouchers as they should have done under the duty which they as trustees owed to the bondholders and general creditors, a complicated problem confronted those conducting the proceedings before the master to supplement and explain the entries in the books and vouchers by oral and documentary evidence. This necessitated the taking of a large amount of oral testimony besides the production of documentary evidence, involving a delay of several years and the incurring of heavy costs and expenses and the loss of interest to the bondholders and general creditors whom the receivers were in duty bound to protect. The loss thus occasioned resulting to the bondholders and general creditors will amount to many thousand dollars and is largely attributable to the negligent omission by the receivers to keep their accounts in such form and with such particularity as to be intelligible to those for whom they were trustees.

[4] Further, the receivers claim credit for large sums improperly expended by them without authority of the court in an unsuccessful effort to reorganize the steel company or "sell the plant as a whole at private sale," before receiving any authority for either of these purposes. The court never authorized a reorganization of the steel company or a disposition of its plant at private sale, nor did it authorize the sale of the plant until September 21, 1906, when it ordered that it be exposed to public sale. Yet the receivers claim credit for various sums for travelling expenses including a large amount improperly expended from time to time by the receiver Wallace within the period of eighteen months next following the appointment of the receivers December 12, 1904, by way of his travelling expenses and the entertainment of sundry persons whom he consulted on the subject of the disposition of the plant. In many instances travelling expenses were incurred for different purposes, some legitimate and others illegitimate, and were included in a single voucher, and were so expressed as not to be susceptible on their face of an ascertainment of the relative amounts of the legitimate and illegitimate expenditures and in such cases it was necessary to resort to evidence aliunde.

Although the receivers were not or might not have been entitled to any credit by reason of the confusion of their accounts, the master using whatever light he could obtain upon the subject has erred, if erring at all, in treating the receivers with undue liberality in his determination of the amount to which they were entitled to credit by way of travelling expenses. And a statement similar to the above is applicable to the case of credits claimed by the receivers for travelling and other expenses of various officers employed by them with the difference that in the case of such subordinate officers the expenditures were usually stated with greater particularity and were in smaller amounts. The witness Frank W. Todd was permitted to draw from the "petit cash drawer" from time to time considerable sums of money upon depositing in the drawer receipts for the same specifying only that the sums therein mentioned were for "expenses," without any itemization whatever.

Further, the evidence shows that the receivers were extravagant and at fault in employing and paying an unnecessary number of clerks

and employees and renting an unnecessary number of offices at a large expenditure until after the sale and delivery of the real and personal property of the steel company, and retaining thereafter, and at least until the order of reference to the master July 27, 1910, two clerks on substantial salaries when there were no sufficient receipts or need for clerical assistance to justify that course.

Further, the receiver Wallace was the owner of bonds and capital stock of the steel company to the amount of about $200,000. It does not appear that the receiver Winchester owned either bonds or stock of that company. A given plan for reorganization might be very advantageous to a large bondholder and stockholder, and at the same time detrimental to other bondholders and general creditors. The evidence points unmistakably to an effort on the part of the receivers to secure a reorganization of the steel company without any authority on their part so to do. The large amount of travelling expenses together with other evidence in the case cannot be reconciled with a mere intent on the part of the receivers to effect a sale in contradistinction to a reorganization of the company. And this accounts for much of the delay in the performance of their duties as receivers and in their settlement of the estate.

The evidence shows that the receivers with respect to a number of matters affecting the interests of the bondholders and general creditors proceeded without due consideration of their authority, or any application through their counsel for instructions, and they seek to justify themselves for entering into sundry unauthorized transactions upon the ground that no loss resulted to the estate. This is particularly true of what was designated in the argument as the "trading account." The receivers on their petition to the court had received authority to manufacture certain portions of unmanufactured materials as in their judgment would facilitate or render more profitable the sale and disposition of the product, and to purchase from time to time such materials as would "enable them to carry on such limited manufacture as above authorized, and to purchase such manufactured materials in the open market as in their judgment would be profitable to complete lots of manufactured products of said company for the purpose of the sales thereof hereinbefore authorized." Instead of confining themselves within the limits of the authority thus conferred the receivers used the funds of the estate for the purchase of manufactured material to a large amount, not within the scope of their authority, and resold the same claiming that they had thereby made a profit of about $3,000, but without taking into consideration any expenses for carrying on the operation. The evidence in fact shows that the receivers improperly conducted the "trading account" prior to receiving any authority under their above mentioned petition.

Further, the management of the estate of the steel company by the receivers displays much improvidence, irregularity and negligence. This court does not impute to either of the receivers a dishonest or immoral intent. But solely as illustrative of the laxity which marked their dealings with the property of the estate, it appears from the evidence that the receiver Wallace made use of its funds for the purchase of certain coal for himself and sundry employees of the receivers

without causing any charge therefor to be made on the receivers' books, although admitting before the master on the reference this irregularity. Doubtless this was an innocent error but, occurring on the part of a receiver, discloses a degree of inattention or negligence not compatible with a proper discharge of the fiduciary duties attaching to the position. No case can be marked by such delay, irregularities and loss to creditors largely through the inattention or negligence of the receivers as have been here displayed without causing reproach to the administration of justice. It is impossible to read the evidence, the briefs of counsel and the report of the master without being impressed with the conviction that the receivers largely dealt with the property of the steel company without any just recognition of the obligation they were under to act only according to their authority, but in the same manner as if they and not the court had sole jurisdiction and power over the administration and disposition of the estate.

[5] It was urged with much insistence by the counsel for the receivers that from the nature and circumstances of their appointment they were clothed with a discretion in the exercise of their official duty and could not be held accountable for any loss or damage resulting to the creditors of the steel company from an honest exercise of that discretion. This is true, subject to the important proviso, that in the exercise of their discretionary power they were not guilty of carelessness, negligence, extravagance, or other fault resulting in loss, which would and should have been avoided by reasonably prudent men in the discharge of their duty as trustees. In the present case the receivers in their management of the estate clearly did not satisfy the proviso.

It is claimed that the receiver Wallace is entitled to consideration and commendation by reason of the fact that he succeeded in collecting from certain pools the sum of $62,791.62, and turning it over to the receivers and that while he in his private capacity had no title to the above sum, or any part of it, yet it was solely on account of his personality that it was possible to collect the same. It should be said with respect to this matter that the evidence, documentary and circumstantial, shows to a moral demonstration that as between Wallace and the estate of the steel company whatever right there was to receive the above sum was vested, not in Wallace, but in the estate and that it was obtained by the receivers by virtue of their receivership.

Wallace was the managing receiver and to him mainly attaches such culpability as is shown in the settlement of the estate of the steel company. But at the same time Winchester as a co-receiver who failed to scrutinize more closely what was done cannot be exonerated. If he be the victim of misplaced confidence he must nevertheless bear the consequences.

In the decision of this case the court is bound to consider the interests of the creditors of the steel company as well as those of the receivers, and it would be grossly at fault were it without sufficient cause to permit itself to lean in favor of the receivers and against the creditors who are the beneficiaries for whom the receivership was constituted.

207 F.—40

[6] It is impracticable, as it is unnecessary, to discuss in detail the various exceptions taken by the respective parties to the master's findings. He has with unusual assiduity and ability treated and disposed of the subject-matter of the exceptions in his voluminous and well considered report. He was confronted with a duty most embarrassing in some respects, calling for the exercise of sound judgment, especially in the matter of making partial allowances of credits claimed by the receivers where through omission by them in their books and vouchers to separate proper from improper items there was no means of reaching a clear and mathematical division or apportionment. In the discharge of this delicate and difficult duty he has displayed sound judgment and zeal to reach proper results.

I am satisfied after an examination of the record and of the arguments of counsel that his findings, conclusions and recommendations should not be disturbed. It may be that the court in the absence of a reference might have been less liberal to the receivers and their counsel, but on the whole I think there is no substantial ground of objection.

With respect to the disposition of the costs and expenses of the reference in question I am not prepared to overrule the finding of the master that they should be borne equally by the receivers and the estate.

The exceptions to the findings of the master must be overruled and his report in all respects approved and confirmed. Let a decree in accordance with this opinion be prepared and submitted.